SANDRA COTE-WHITACRE & others[1] *vs*. DEPARTMENT OF
PUBLIC HEALTH & others[2] (and a companion case[3]).

Suffolk. October 6, 2005. - March 30, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*License. Due Process of Law,* Marriage. *Uniform Marriage Evasion Act.
Statute,* Construction. *Due Process of Law,* Marriage. *Constitutional Law,*
Equal protection of laws, Privileges and immunities. *Injunction. Practice,
Civil,* Appeal, Preliminary injunction, Standing. *Comity.*

This court affirmed an order of the Superior Court denying motions for
preliminary injunction brought by the plaintiffs, eight nonresident same-
sex couples and municipal clerks, in an action challenging the constitution-
ality of G. L. c. 207, § 11 and 12, as well as the interpretation and enforce-
ment of those statutory provisions to prohibit the issuance of Massachusetts
marriage licenses to nonresident same-sex couples; further, this court
ordered that the cases of certain plaintiffs proceed in the Superior Court,
on an expedited basis, to determine whether same-sex marriage is
prohibited in the home States of those plaintiffs. [352]
SPINA, J., with whom COWIN and SOSMAN, JJ., joined, concurred on the ground
that the plaintiffs were unable to demonstrate a likelihood of success on
the merits of their claims, based on the conclusion that the effect of the
statutory provisions at issue was to preclude all nonresident same-sex
couples from marrying in Massachusetts, except to the extent that such
marriages were not prohibited in the States of such couples' domicil, and
that enforcement of the provisions to prohibit the issuance of marriage
license to nonresident same-sex couples did not impermissibly infringe
their constitutional due process or equal protection rights, did not constitute
improper selective enforcement of a statutory scheme, and did not violate
the privileges and immunities clause of the Federal Constitution. [352-382]
MARSHALL, C.J., with whom CORDY, J., joined, and GREANEY, J., joined in part,
concurred, but was of the opinion that G. L. c. 207, § 12, which prevents
clerks from issuing marriage licenses to out-of-State residents who are
"prohibited from intermarrying by the laws" of their home State, extended
only to marriages that were expressly forbidden by the home State's posi-

---

[1]Roberta Cote-Whitacre; Amy Zimmerman and Tanya Wexler; Mark Pears-
all and Paul Trubey; Katrina and Kristin Gossman; Judith and Lee McNeil-
Beckwith; Wendy Becker and Mary Norton; Michael Thorne and James The-
berge; and Edward Butler and Leslie Schoof.

[2]Commissioner of Public Health, registry of vital records and statistics, and
registrar of vital records and statistics.

[3]Town clerk of Provincetown & others *vs*. Attorney General & others.

tive law, i.e., by constitutional amendment, statute, or controlling appellate court decision, and therefore concluded that the requirements of both the statute and equal protection demanded that nonresident same-sex couples who wished to marry in Massachusetts, and who resided in States where they were not expressly prohibited from marrying by positive law, be permitted to present evidence to rebut the Commonwealth's claims that their home State would prohibit their marriage. [382-393]

GREANEY, J., concurred with the conclusion that the plaintiffs failed to demonstrate that there was no conceivable rational basis for the provisions of G. L. c. 207, §§ 11 and 12, and also concurred with the statutory analysis of MARSHALL, C.J., that the construction of the prohibition of G. L. c. 207, § 12, as endorsed by SPINA, J., was overly restrictive. [393-395]

IRELAND, J., dissented on the grounds that the principle of gender neutrality in marriage licensing, as expressed in *Goodridge* v. *Department of Public Health,* 440 Mass. 309 (2003), applied to the entire marriage statute, G. L. c. 207; that principles of comity did not require rejection of the marriage license applications of nonresident same-sex couples; and that the resurrection and selective enforcement of a moribund statute offended notions of equal protection and fundamental fairness. [395-412]


CIVIL ACTIONS commenced in the Superior Court Department on June 18, 2004.

Motions for injunctive relief and for reconsideration were heard by *Carol S. Ball,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Michele E. Granda* (*Gary D. Buseck* with her) for the plaintiffs.

*Kevin D. Batt* (*Anne Robbins & Sarah R. Wunsch* with him) for town clerk of Provincetown & others.

*Peter Sacks,* Assistant Attorney General, for Department of Public Health & others.

The following submitted briefs for amici curiae:

*Kenneth J. Parsigian & Shirley Sperling Paley* for Erwin Chemerinsky & others.

*Kathleen M. O'Donnell, Mark D. Mason, Martin W. Healy, Peter F. Zupcofska, Elizabeth M. Duffy, Darien K.S. Fleming, Eleanor H. Gilbane, Shu-Yi Oei, Matthew D. Schnall, & Corin R. Swift* for Massachusetts Bar Association & another.

*Anthony Mirenda, Vickie L. Henry, Sara K. Pildis, & Bradley E. Abruzzi* for Asian American Legal Defense and Education Fund & others.

*Barbara J. Cox*, of California, *& Jonathan A. Shapiro, Maura T. Healey, Joseph J. Mueller, Steven P. Lehotsky, & Miranda Hooker* for Barbara J. Cox & others.

*George I. Goverman*, pro se.

*Benjamin W. Bull, Glen Lavy, Randall Wenger, & Dale Schowengerdt*, of Arizona, *& Philip D. Moran* for Raymond Flynn & another.

BY THE COURT. The orders denying the plaintiffs' motions for preliminary injunction in these cases are affirmed. A majority of the Justices also agree that, as to the plaintiffs who reside in Connecticut, Maine, New Hampshire, and Vermont, a judgment for the defendants shall enter in the Superior Court because same-sex marriage is prohibited in those States. As to the New York and Rhode Island plaintiffs, their cases shall proceed in the Superior Court, on an expedited basis, for a determination whether same-sex marriage is prohibited in those States.

*So ordered.*

SPINA, J. (concurring, with whom Cowin and Sosman, JJ., join). In these companion cases, eight nonresident same-sex couples[1] (couples) and thirteen municipal clerks (clerks) (collectively, plaintiffs) have challenged the constitutionality of G. L. c. 207, §§ 11 and 12, as well as the interpretation and enforcement of these statutory provisions to prohibit the issuance of Massachusetts marriage licenses to nonresident same-sex couples. The backdrop for their challenges is our decision in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003). A judge in the Superior Court denied the plaintiffs' motions for preliminary injunctions to bar the ongoing enforcement of §§ 11 and 12, and we allowed the defendants' application for direct appellate review.[2] For the reasons that follow, I conclude that the plaintiffs' motions for preliminary injunctions were properly denied.

[1] The couples live in Vermont, New York, Connecticut, Rhode Island, Maine, and New Hampshire.

[2] Amicus briefs have been filed by the Massachusetts Bar Association and the Boston Bar Association; nine professors of United States constitutional law; twenty-three professors of conflict of laws and family law; thirty-nine civil rights organizations and university professors; George I. Goverman; and

1. *Statutory framework.* General Laws c. 207, the marriage licensing statute, controls entry into civil marriage in this Commonwealth. As a preliminary matter, I set forth those statutory provisions that will be pertinent to the ensuing discussion. Sections 11 and 12, were first enacted by St. 1913, c. 360, as part of the Uniform Marriage Evasion Act.[3]

General Laws c. 207, § 11, directed at who may not marry in Massachusetts, provides as follows:

> "No marriage shall be contracted in this commonwealth by a party residing and intending to continue to reside in another jurisdiction if such marriage would be void if contracted in such other jurisdiction, and every marriage contracted in this commonwealth in violation hereof shall be null and void."

General Laws c. 207, § 12, directed at the responsibilities of municipal clerks, provides as follows:

> "Before issuing a license to marry a person who resides and intends to continue to reside in another state, the officer having authority to issue the license shall satisfy himself, by requiring affidavits or otherwise, that such person is not prohibited from intermarrying by the laws of the jurisdiction where he or she resides."

General Laws c. 207, § 13, directed at the construction of §§ 11 and 12, provides as follows:

> "The . . . preceding sections shall be so interpreted and construed as to effectuate their general purpose to make uniform the law of those states which enact like legislation."

2. *Factual and procedural background.* To marry in Massachusetts, all applicants for a certificate of intention of mar-

---

Raymond Flynn and Thomas Shields.

[3]In 1912, the National Conference of Commissioners on Uniform State Laws approved the Uniform Marriage Evasion Act. Although the Commissioners ultimately withdrew their approval of the Act in 1943, Massachusetts was one of the few States that had already enacted its provisions, which remain in effect. See Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings 64 (1943).

riage, commonly known as a marriage license, must complete a
written notice of intention of marriage (notice) on forms
provided by the registrar of vital records and statistics
(registrar), and submit it to the clerk or registrar of any city or
town in the Commonwealth, along with the appropriate fee.[4]
See G. L. c. 207, §§ 19, 20. The notice shall include "a state-
ment of absence of any legal impediment to the marriage, to be
given before such town clerk under oath by both of the parties
to the intended marriage." *Id.* at § 20. The applicants also shall
provide the clerk with the residence address of both parties. See
*id.*

On or after the third day from the filing of the notice (or
sooner if the time period has been waived by a judge), the clerk
shall deliver the marriage license to the parties. See *id.* at §§ 19,
28, 30. Then, an authorized officiant may solemnize the
marriage. See *id.* at §§ 28, 38-39. After solemnization, the offi-
ciant completes the portion of the license setting forth the time
and place of the ceremony, signs it, and returns it to the clerk
who issued it. See *id.* at § 40. The clerk records the marriage in
the appropriate registry, transmits the original record of the
marriage and all documentary evidence to the registrar, and
retains a certified copy of the license. See G. L. c. 46, §§ 1-2,
17A. The Commissioner of Public Health (commissioner) binds
the marriage records with indexes thereto and retains their
custody. See G. L. c. 111, § 2.

To provide guidance to applicants as to what constitutes a
"legal impediment" to marriage, clerks must display, in a
conspicuous location, a printed notice of the prohibitions to
marriage in Massachusetts, provided to them by the commis-
sioner and the registrar. See G. L. c. 207, § 37. See also G. L.
c. 17, § 4 (pertaining to responsibilities of registrar). The notice
specifically incorporates the language of G. L. c. 207, § 11. The

---

[4]The Department of Public Health is statutorily charged with safeguarding
public health. See G. L. c. 17. It oversees the registry of vital records and
statistics, which enforces the laws and promulgates the policies and procedures
relating to the issuance of marriage licenses. See G. L. c. 17, § 4; G. L.
c. 207, §§ 20, 28A, 37. The registry is headed by a registrar of vital records
and statistics, appointed by the Commissioner of Public Health with the ap-
proval of the public health council and supervised by the commissioner. See
G. L. c. 17, § 4.

registrar has also issued to clerks a guide setting forth legal impediments to marriage in the fifty States, the District of Columbia, and various territories of the United States. The clerks were informed by the registrar that they should not issue a marriage license to an applicant if, based on a comparison between the factual information set forth on the notice and the list of legal impediments to marriage, there is an impediment to the applicant marrying in Massachusetts or in the applicant's home State.

Beginning on May 17, 2004, the date this court's decision in *Goodridge* v. *Department of Pub. Health, supra,* became effective, municipal clerks in several cities and towns began to receive notices of intention of marriage from nonresident same-sex couples. Five of the couples herein received licenses and had their marriages solemnized. Three of the couples were denied marriage licenses. The office of the Attorney General contacted those cities and towns where the marriage licenses had been issued, instructed them to cease and desist from issuing such licenses, and directed their attention to G. L. c. 207, § 50, setting forth the penalties for noncompliance with G. L. c. 207, §§ 11 and 12. In response, the clerks at issue stopped accepting notices from nonresident same-sex couples.

On June 18, 2004, the couples brought an action against the Department of Public Health, the commissioner, the registry of vital records and statistics, and the registrar (collectively, the defendants),[5] seeking declaratory and injunctive relief and relief in the nature of mandamus. The couples claimed that the defendants' enforcement of § 11 and 12 to deny marriage licenses to nonresident same-sex couples violated the due process and equal protection provisions of the Massachusetts Constitution and violated the privileges and immunities clause of the United States Constitution, art. IV, § 2. They further alleged that the defendants improperly construed the meaning of §§ 11 and 12 to deny marital rights to nonresident same-sex couples from States that have not declared such marriages void. Finally, the couples asserted that the commissioner failed to

[5]For the sake of simplicity, when I collectively refer to the defendants, I also include the Attorney General, who is one of the defendants named in the clerks' complaint, along with the commissioner and the registrar.

execute her duty to bind and index the marriage licenses already issued to nonresident same-sex couples, in violation of G. L. c. 111, § 2.

The couples then filed a motion for a preliminary injunction, seeking a declaration that G. L. c. 207, § 11, was unconstitutional, that the defendants were enjoined from enforcing it with respect to nonresident same-sex couples, and that the defendants were required to process notices from such couples as they were filed. A judge in the Superior Court denied the couples' motion, stating that they had failed to make the requisite showing of a likelihood of success on the merits of their claims.[6] While noting that § 11 appeared to violate the "spirit" of *Goodridge* v. *Department of Pub. Health, supra,* the judge concluded that the couples had not demonstrated that § 11 had been enacted or was being enforced to discriminate against nonresident same-sex couples.

On June 18, 2004, the clerks, in their official capacities, brought an action against the Attorney General, the commissioner, and the registrar, seeking declaratory and injunctive relief. The clerks alleged that they were being compelled to selectively enforce G. L. c. 207, §§ 11 and 12, in a manner that impermissibly discriminated against nonresident same-sex couples. They sought to enjoin the defendants from prosecuting them under G. L. c. 207, § 50, or from otherwise requiring that they enforce the provisions of §§ 11 and 12. The clerks also sought a declaration that §§ 11 and 12 were unconstitutional as applied to nonresident same-sex couples.

The clerks then filed a motion for a preliminary injunction, seeking to prevent the enforcement of §§ 11 and 12 and to bar the defendants from taking punitive action against them under § 50. On August 10, 2004, the clerks amended their complaint to clarify that they were bringing their action in both their individual and official capacities. A judge in the Superior Court denied the clerks' motion for a preliminary injunction, concluding that they lacked standing, in their official capacities, to challenge the constitutionality of State statutes. The clerks subsequently filed a motion for reconsideration in light of the

---

[6]In light of this conclusion, the judge did not address the question of irreparable harm. See note 19, *infra.*

filing of their amended complaint. The judge denied the motion on the grounds that, even if the clerks had standing, they, like the couples, would be unable to demonstrate a likelihood of success on the merits of their claims, and the clerks had failed to show any imminent irreparable harm for which they would be entitled to a preliminary injunction.

3. *Standard of review.* The focus of appellate review of the denial of a motion for a preliminary injunction is "whether the judge applied proper legal standards and whether there was reasonable support for [her] evaluation of the factual questions." *Hull Mun. Lighting Plant* v. *Massachusetts Mun. Wholesale Elec. Co.,* 399 Mass. 640, 642 (1987), citing *Packaging Indus. Group, Inc.* v. *Cheney,* 380 Mass. 609, 615 (1980). "Where there is no dispute regarding the facts of the case and no credibility determinations on which we would defer to the judge, we draw our own conclusions from the evidence in the record." *Siemens Bldg. Techs., Inc.* v. *Division of Capital Asset Mgt.,* 439 Mass. 759, 762 (2003). A party seeking a preliminary injunction must show that (1) success is likely on the merits; (2) irreparable harm will result from denial of the injunction; and (3) the risk of irreparable harm to the moving party outweighs any similar risk of harm to the opposing party. See *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 616-617. When a party seeks to enjoin governmental action, the judge is "required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Commonwealth* v. *Mass. CRINC,* 392 Mass. 79, 89 (1984). See *Loyal Order of Moose, Inc., Yarmouth Lodge # 2270* v. *Board of Health of Yarmouth,* 439 Mass. 597, 601 (2003). When the judge's decision is predicated solely on documentary evidence, an appellate court may draw its own conclusions from the record. See *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 616.

4. *Statutory construction of G. L. c. 207.* The couples contend that, by the specific terms of G. L. c. 207, §§ 11 and 12, only persons residing in States where their marriage is expressly declared "void" are precluded from marrying in Massachusetts. They assert that persons residing in States where same-sex marriage is "prohibited," or where the law is silent on the marriage

eligibility of same-sex couples, are not similarly precluded from marrying in this Commonwealth. Within the statutory framework of G. L. c. 207, the couples interpret § 11 as the substantive "reverse evasion" provision, and § 12 as merely the enforcement mechanism of § 11. They argue that there is no logical basis for expanding the reach of § 11 by giving substantive force to § 12. Accordingly, the couples contend that the word "prohibited" in § 12 must not be interpreted in such a way as to deny all nonresident same-sex couples the right to marry in Massachusetts. I disagree with the couples' narrow reading of §§ 11 and 12, and I conclude that the effect of those statutory provisions is to preclude all nonresident same-sex couples from marrying in Massachusetts, except to the extent that such marriages are not prohibited in their States of domicil.

General Laws c. 207 serves both a gatekeeping and a record-keeping function. See *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 317-318 (2003). The focus here is on the statute's gatekeeping function because the couples have claimed that, pursuant to the statute, nonresident same-sex couples are being denied entrance to the institution of marriage. While the gatekeeping provisions of G. L. c. 207 are not extensive, they do establish minimum qualifications for obtaining a marriage license. *Id.* at 317.

"A fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result." *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and courts must interpret the statute so as to render the legislation effective, consonant with reason and common sense. See *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996); *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n*, 394 Mass. 233, 240 (1985); *Tilton* v. *Haverhill*, 311 Mass. 572, 577-578 (1942). The provisions of G. L. c. 207 "must be construed, where capable, so as to constitute a harmonious whole consistent with the legislative purpose." *Labor Relations Comm'n* v. *Selectmen of Dracut*, 374 Mass. 619, 624 (1978), quoting *Chief of Police of Dracut* v. *Dracut*, 357 Mass. 492,

499 (1970). See *Polaroid Corp.* v. *Commissioner of Revenue,* 393 Mass. 490, 497 (1984) ("words of a statute must be construed in association with other statutory language and the general statutory plan"). Thus, harmony and consistency within the statutory scheme set forth in G. L. c. 207 necessitate reading §§ 11 and 12 together. See *LeClair* v. *Norwell,* 430 Mass. 328, 333 (1999) (statutory language not read in isolation).

Massachusetts follows the general rule that the validity of a marriage is governed by the law of the State where the marriage is contracted.[7] See *Damaskinos* v. *Damaskinos,* 325 Mass. 217, 219 (1950). See also *Ex parte Suzanna,* 295 F. 713, 715 (D. Mass. 1924). When a person domiciled in another State comes to Massachusetts with the intent to marry, that person's ability to enter into a valid marriage contract, in the first instance, is governed by G. L. c. 207, §§ 11 and 12, which, in turn, mandate that the Commonwealth look to the marriage laws of the person's domiciliary State. The language of § 12 is plain and unambiguous that a municipal clerk, who is vested with the authority to issue or deny a marriage license, see G. L. c. 207, §§ 20, 28, 35, must be satisfied that the applicant "is not prohibited from intermarrying" by the laws of the applicant's home State.

One such prohibition is described in the narrow and specific language of § 11. The applicant is a nonresident who plans to continue residing outside Massachusetts, and the marriage would be "void" if contracted in the applicant's home State. See, e.g., Me. Rev. Stat. Ann. tit. 19-A, §§ 701, 751 (West 1998) (persons of same sex may not contract marriage and such marriage, if solemnized in Maine, is void). In other words, the relevant statutory language of the applicant's home State explicitly provides that particular marriages are "void."[8] Under Massachusetts law, not only are such marriages not to be contracted in the first place,

---

[7]A significant exception to this general rule is set forth in G. L. c. 207, § 10, which provides: "If any person residing and intending to continue to reside in this commonwealth is disabled or prohibited from contracting marriage under the laws of this commonwealth and goes into another jurisdiction and there contracts a marriage prohibited and declared void by the laws of this commonwealth, such marriage shall be null and void for all purposes in this commonwealth with the same effect as though such prohibited marriage had been entered into in this commonwealth."

[8]"[A] void marriage is an absolute nullity and is not entitled to any recognition or legal status." C.P. Kindregan, Jr., & M.L. Inker, Family Law and

but to the extent that such marriages may be erroneously contracted, either intentionally or unintentionally, they are considered "null and void" in Massachusetts and everywhere else. G. L. c. 207, § 11.

A marriage that would be "void" if contracted in the applicant's home State is not, however, the only prohibition that would preclude the issuance of a Massachusetts marriage license to a nonresident. An applicant may be prohibited from intermarrying by the laws of the applicant's home State because of a variety of other statutory legal impediments to marriage, including age, consanguinity or affinity, mental incompetence, or the fact that both parties are the same sex.[9] In essence, marriages

Practice § 19:2, at 736 (3d ed. 2002). See Black's Law Dictionary 1604 (8th ed. 2004) ("void" defined as "[o]f no legal effect; null"). In Massachusetts, for example, a marriage that is incestuous under the consanguinity or affinity statutes is "void without a judgment of divorce or other legal process." G. L. c. 207, § 8. A polygamous marriage, except as specifically provided, is also "void." See G. L. c. 207, § 4.

[9] General Laws c. 207, § 37, provides that "[t]he commissioner of public health shall furnish to the clerk or registrar of every town a printed list of all legal impediments to marriage, and the clerk or registrar shall forthwith post and thereafter maintain it in a conspicuous place in his office." In Massachusetts, the legal impediments to marriage include (1) consanguinity or affinity; (2) polygamy (except as specifically provided); (3) age (except as specifically provided); and (4) the presence of communicable syphilis in one of the parties. See G. L. c. 207, §§ 1, 2, 4, 6, 7. In Vermont, the legal impediments to marriage include (1) consanguinity or affinity; (2) bigamy; (3) sex; (4) age (except as specifically provided); (5) lack of sound mind; and (6) need for a guardian (except as specifically provided). See Vt. Stat. Ann. tit. 15, §§ 1-4, 8 (LexisNexis 2002); Vt. Stat. Ann. tit. 18, § 5142 (Lexis 2000). In New York, the legal impediments to marriage include (1) consanguinity or affinity; (2) bigamy (except as specifically provided); (3) age (except as specifically provided); (4) lack of consent for want of understanding; (5) physical cause; (6) consent secured by reason of force, duress, or fraud; and (7) mental illness for five or more years. See N.Y. Dom. Rel. Law §§ 5, 6, 7 (McKinney 1999). In Connecticut, the legal impediments to marriage include (1) consanguinity or affinity; (2) need for a conservator (except as specifically provided); (3) age (except as specifically provided); and (4) bigamy (except as specifically provided). See Conn. Gen. Stat. Ann. §§ 46b-21, 46b-29, 46b-30 (West 2004); Conn. Gen. Stat. Ann. § 53a-190 (West 2001). Cf. *Rosengarten* v. *Downes*, 71 Conn. App. 372, 378 (2002) (concluding that, in action to dissolve civil union entered into in Vermont by Connecticut resident, such union not a "marriage" recognized under Connecticut statutes because not entered into by one man and one woman). In Rhode Island, the legal impediments to marriage include (1) consanguinity or affinity (except as specifically provided);

that are defined by State statutes as "void" constitute a specific category of marriages that are prohibited under G. L. c. 207.[10]

Beyond statutory prohibitions to marriage, the issue whether an applicant for a marriage license in Massachusetts is "prohibited from intermarrying by the laws of the jurisdiction where he or she resides," G. L. c. 207, § 12, may be resolved by consideration of the common law of the applicant's home State, which is continually evolving. In Massachusetts, for example, the court opined in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 343 (2003), that "established principles of jurisprudence empower[] a court to refine a common-law principle in light of evolving constitutional standards." Accordingly, this court refined the common-law definition of civil marriage to mean "the voluntary union of two persons as spouses, to the exclusion of all others." *Id.* To the extent that the statutes of an applicant's home State may be silent or ambiguous on the issue of same-sex marriage, it is the common law of that State that becomes determinative of whether such applicant is prohibited from intermarrying by the laws of the applicant's home State. See, e.g., *Samuels* v. *State Dep't of Health*, 29 A.D.3d 9 (N.Y. 2006) (concluding that

_____

(2) bigamy; (3) lack of mental competence; and (4) age (except as specifically provided). See R.I. Gen. Laws §§ 15-1-1, 15-1-2, 15-1-4, 15-1-5, 15-2-11 (LexisNexis 2003). In Maine, the legal impediments to marriage include (1) age (except as specifically provided); (2) consanguinity (except as specifically provided); (3) mental illness or mental retardation; (4) polygamy; and (5) sex. See Me. Rev. Stat. Ann. tit. 19-A, §§ 652, 701 (West 1998). In New Hampshire, the legal impediments to marriage include (1) consanguinity; (2) sex; and (3) age (except as specifically provided). See N.H. Rev. Stat. Ann. §§ 457:1, 457:2, 457:4, 457:6 (1992).

[10]Marriages that are prohibited but not deemed "null and void" may be "voidable." "A marriage which is voidable . . . is presumably valid and should for all legal purposes be treated as a valid marriage unless and until a court of competent jurisdiction has annulled it or entered a declaratory judgment determining that it is null." C.P. Kindregan, Jr., & M.L. Inker, *supra* at § 19:3. See *Robbins* v. *Robbins*, 343 Mass. 247, 251-252 (1961) (voidable marriage considered valid until annulled); *Callow* v. *Thomas*, 322 Mass. 550, 555 (1948) (same). In Massachusetts, for example, fraud that goes to the essence of a marriage contract renders a marriage "voidable." See *Reynolds* v. *Reynolds*, 3 Allen 605, 609-611 (1862). A marriage entered into by a minor or by a person under conservatorship is not "void" but may be "voidable." See *Bradford* v. *Parker*, 327 Mass. 446, 449 (1951); *Parton* v. *Hervey*, 1 Gray 119, 122 (1854). Further, "impotency does not render a marriage void, but only voidable at the suit of the party conceiving himself or herself to be wronged." *Martin* v. *Otis*, 233 Mass. 491, 495 (1919).

New York domestic relations law constitutional to extent it prohibits issuance of marriage licenses to same-sex couples); *Seymour* v. *Holcomb*, 26 A.D.3d 661 (N.Y. 2006) (concluding that Legislature intended marriage to be between one man and one woman); *Hernandez* v. *Robles*, 26 A.D.3d 98 (N.Y. 2005) (concluding that New York domestic relations law, which limits civil marriage to opposite-sex couples, does not violate due process and equal protection provisions of State Constitution); *Langan* v. *St. Vincent's Hosp. of N.Y.*, 25 A.D.3d 90 (N.Y. 2005) (surviving partner of same-sex civil union not entitled to bring wrongful death action as "surviving spouse"); *Matter of Estate of Cooper*, 187 A.D.2d 128, 132 (N.Y.), appeal dismissed, 82 N.Y.2d 801 (1993) ("surviving spouse" entitled to claim right of election against decedent's will does not include same-sex life partner).

My interpretation of G. L. c. 207, §§ 11 and 12, is supported by the language of G. L. c. 207, § 50, which provides:

> "Any official issuing a certificate of notice of intention of marriage knowing that the parties are *prohibited by [§ 11]* from intermarrying, and any person authorized to solemnize marriage who shall solemnize a marriage knowing that the parties are so *prohibited*, shall be punished by a fine of not less than one hundred or more than five hundred dollars or by imprisonment for not more than one year, or both" (emphasis added).

The language of § 50 reinforces my construction of §§ 11 and 12 that marriages explicitly deemed "void" pursuant to § 11 constitute one specific category of marriages that are *prohibited* under G. L. c. 207. Given this specific and limiting reference to § 11 in § 50, the statute is clear that the penalties imposed by § 50 are not applicable to the erroneous issuance of a marriage license where the marriage is generally prohibited under § 12.[11]

Such interpretation of §§ 11 and 12 is further bolstered by

---

[11]To the extent that a prohibited marriage may be erroneously contracted, the language of § 12, unlike the language of § 11, does not state that such marriages are automatically deemed "null and void." Rather, at that juncture, it is the province of the applicants' home State to decide whether and how to recognize the erroneously contracted marriage once the couple returns to their

the fact that the 1913 statute was entitled "An Act to make uniform the law relating to marriages in another state or country in evasion or violation of the laws of the state of domicile." St. 1913, c. 360. This title suggests that the statute broadly precludes the issuance of a marriage license in Massachusetts where the proposed marriage would be in violation of the laws of the domicil State, either because it is expressly deemed "void," or because it is prohibited by constitutional amendment, by the common law, or by State statutory language to the effect that such marriage is not permitted, not recognized, not valid, or the like. See *Commissioner of Corps. & Taxation* v. *Chilton Club*, 318 Mass. 285, 292 (1945) (title is "a part of the act, and resort may be had to it as an aid in [its] interpretation"). See also *Kerins* v. *Lima*, 425 Mass. 108, 114 (1997) (same). My analysis of §§ 11 and 12 also satisfies the mandate of G. L. c. 207, § 13, to "make uniform the law of those states which enact like legislation." By concluding that §§ 11 and 12, taken together, as they must, preclude the issuance of a marriage license to any nonresident same-sex couple who would be prohibited from marrying in their home State, the uniformity of those States' laws that, to date, have prohibited same-sex marriage is preserved.

It is not the province of this court to dictate to other States how to construe their own specific statutes and public policy when confronted with the issue whether to recognize a same-sex marriage performed in Massachusetts. I only purport to analyze our own statutes, bearing in mind that, in doing so, the settled law of other jurisdictions must be considered. If other jurisdictions choose to recognize same-sex marriage, either by way of legislative enactment or under the common law, this opinion will serve as a blueprint for nonresident same-sex couples to know whether a municipal clerk in this Commonwealth can properly issue them a marriage license.[12] I conclude that the couples will be unable to demonstrate a likeli-

home State. See generally Restatement (Second) of Conflict of Laws § 283 (1971) (pertaining to the validity of marriages already contracted).

[12]Chief Justice Marshall contends that the couples from Rhode Island and New York, States where same-sex marriage is not expressly prohibited by constitutional amendment, statute, or existing appellate court decision, should be allowed to proceed to trial to present evidence to rebut the Com-

hood of success on the merits of their statutory construction claim.[13]

5. *Due process and equal protection analysis.* The couples contend that the Commonwealth's enforcement of G. L. c. 207, §§ 11 and 12, to prohibit the issuance of marriage licenses to nonresident same-sex couples, violates their due process and equal protection rights under arts. 1, as amended by art. 106 of the Amendments, 6, 7, and 10 of the Massachusetts Declaration of Rights.[14] They argue that such enforcement is inconsistent

monwealth's claim that their home States would prohibit Massachusetts marriages. See *post* at 388, 391-393 (Marshall, C.J., concurring). I am not opposed to such further proceedings. Where I differ from the Chief Justice is in the analysis that should be used to determine whether those couples are, in fact, "prohibited" from intermarrying by the common law of their home States. The Chief Justice asserts that, in the absence of an existing appellate court decision specifically prohibiting same-sex marriage in the home State, such marriages are permitted. See *post* at 385 (Marshall, C.J., concurring). It is my view that, in the absence of such an existing appellate court decision, it is necessary to look at the home State's general body of common law and ascertain whether that common law has interpreted the term "marriage" as the legal union of one man and one woman as husband and wife. See *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 319 (2003). If it has, then same-sex marriage would be "prohibited" in that State, and the couples from Rhode Island and New York would not be able to secure a marriage license in Massachusetts. Conversely, if the common law of the home State has not construed "marriage" in such a manner, then it cannot be concluded that same-sex marriage has been "prohibited" in that State. I emphasize that this analysis is only applicable where, as in very few States, there has been no constitutional or statutory pronouncement on the matter.

[13]At this juncture, I need not analyze how the Defense of Marriage Act, which has been adopted by many, but not all, States, would affect the eight couples when they return to their home States. See 1 U.S.C. § 7 (2000); 28 U.S.C. § 1738C (2000). That Federal enactment defines the word "marriage" as meaning "only a legal union between one man and one woman as husband and wife." 1 U.S.C. § 7. Further, "[n]o State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship." 28 U.S.C. § 1738C. The focus here is on whether nonresident same-sex couples can, in the first instance, be granted a marriage license in this Commonwealth, in accordance with G. L. c. 207, §§ 11 and 12.

[14]Article 1, as amended by art. 106 of the Amendments to the Massachusetts Declaration of Rights, provides: "All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned

with the principles and protections articulated in *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309 (2003), and *Opinions of the Justices,* 440 Mass. 1201 (2004), which, they continue, are applicable to all persons within the Commonwealth, not only those who are residents. Moreover, the couples assert that the Commonwealth is hiding behind the legislative authority conferred by §§ 11 and 12 to improperly impose the discriminatory marriage laws of other States on couples who come to Massachusetts to wed. They contend that §§ 11 and 12 were resurrected and implemented with renewed vigor in the aftermath of the *Goodridge* decision purposely to discriminate against nonresident same-sex couples and that, while §§ 11 and 12 may appear to be facially neutral, their application has a disparate impact on these couples, violating their right to equal protection under the law.

Analysis of the couples' constitutional challenges begins with consideration of the appropriate standard of review, recognizing that in matters of domestic relations, including marriage, the concepts of due process and equal protection often overlap.[15] See *Goodridge* v. *Department of Pub. Health, supra* at 320, and

the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

Article 6 of the Massachusetts Declaration of Rights provides, in relevant part: "No man, nor corporation, or association of men, have any other title to obtain advantages, or particular and exclusive privileges, distinct from those of the community, than what arises from the consideration of services rendered to the public . . . ."

Article 7 of the Massachusetts Declaration of Rights provides: "Government is instituted for the common good; for the protection, safety, prosperity, and happiness of the people; and not for the profit, honor, or private interest of any one man, family or class of men: Therefore the people alone have an incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when their protection, safety, prosperity and happiness require it."

Article 10 of the Massachusetts Declaration of Rights provides, in relevant part: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. . . ."

[15]Although art. 10 may afford greater protection of rights than the due process clause of the Fourteenth Amendment to the United States Constitution, this court's treatment of due process challenges adheres to the same standards followed in Federal due process analysis. See *Commonwealth* v. *El-*

cases cited. Where a statute either burdens the exercise of a fundamental right protected by our State Constitution, or discriminates on the basis of a suspect classification, the statute is subject to strict judicial scrutiny. See *Blixt* v. *Blixt*, 437 Mass. 649, 655-656, 660-661 (2002), cert. denied, 537 U.S. 1189 (2003) (fundamental right); *Lowell* v. *Kowalski*, 380 Mass. 663, 666 (1980) (sex-based classification). See also *Goodridge* v. *Department of Pub. Health, supra* at 330. A fundamental right is one that is "objectively, 'deeply rooted in this Nation's history and tradition,' [*Moore* v. *East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion),] . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " *Washington* v. *Glucksberg*, 521 U.S. 702, 720-721 (1997), quoting *Palko* v. *Connecticut*, 302 U.S. 319, 325, 326 (1937). In this Commonwealth, suspect classifications are currently those of sex, race, color, creed, or national origin. See *Powers* v. *Wilkinson*, 399 Mass. 650, 657 n.11 (1987). See also art. 1. Cf. *Commonwealth* v. *Carleton*, 418 Mass. 773, 774-775 (1994) (suggesting that religion is suspect classification). Under strict scrutiny analysis, a challenged statute will be upheld only if it is "narrowly tailored to further a legitimate and compelling governmental interest." *Aime* v. *Commonwealth*, 414 Mass. 667, 673 (1993). See *Blixt* v. *Blixt, supra* at 660-661.

All other statutes, which neither burden a fundamental right nor discriminate on the basis of a suspect classification, are subject to a "rational basis" level of judicial scrutiny. See *Goodridge* v. *Department of Pub. Health, supra*; *English* v. *New England Med. Ctr., Inc.*, 405 Mass. 423, 428 (1989), cert. denied, 493 U.S. 1056 (1990). For due process claims, rational basis analysis requires that statutes "bear[] a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare." *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422 (1965), quoting *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418 (1940). A statute will be upheld where

*lis*, 429 Mass. 362, 371 (1999). The standard for equal protection analysis under our Declaration of Rights is the same as under the Fourteenth Amendment. See *Dickerson* v. *Attorney Gen.*, 396 Mass. 740, 743 (1986).

it is reasonably related to the furtherance of a valid State interest. See *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing*, 379 Mass. 368, 373-374 (1979). For equal protection claims, rational basis analysis requires that "an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." *English* v. *New England Med. Ctr., Inc.*, *supra* at 429, quoting *Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 452 (1985) (Stevens, J., concurring). See *Goodridge* v. *Department of Pub. Health*, *supra*.

It is well settled that a statute is presumed to be constitutional, and every rational presumption in favor of its validity is to be made. See *St. Germaine* v. *Pendergast*, 416 Mass. 698, 703 (1993); *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 190 (1978). The challenging party bears a heavy burden of demonstrating, beyond a reasonable doubt, that there are no conceivable grounds supporting the legislative enactment. See *St. Germaine* v. *Pendergast*, *supra*. See also *Leibovich* v. *Antonellis*, 410 Mass. 568, 576 (1991). This is especially true with respect to "remedial social enactments." *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, *supra*. "A court is only to inquire into whether the Legislature had the power to enact the statute and not whether the statute is wise or efficient." *St. Germaine* v. *Pendergast*, *supra*. See *Leibovich* v. *Antonellis*, *supra*.

In *Goodridge* v. *Department of Pub. Health*, *supra* at 341, this court opined that the Department of Public Health had failed "to articulate a constitutionally adequate justification for limiting civil marriage to opposite-sex unions." Recognizing that banning same-sex Massachusetts couples from marrying "works a deep and scarring hardship on a very real segment of the community for no rational reason," *id.*, this court concluded that "[l]imiting the protections, benefits, and obligations of civil marriage to opposite-sex couples violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution." *Id.* at 342. General Laws c. 207 did not satisfy the rational basis test for purposes of either due process or equal protection analysis. See *id.* at 331. Nonethe-

less, because no interested party had advocated a complete elimination of the marriage laws, the court preserved G. L. c. 207 and refined the common-law definition of civil marriage, construing it to mean "the voluntary union of two persons as spouses, to the exclusion of all others." *Id.* at 343. This court specifically stated that it was leaving "intact the Legislature's broad discretion to regulate marriage." *Id.* at 343-344. See *Commonwealth* v. *Stowell,* 389 Mass. 171, 175 (1983) (regulation of marriage is properly within scope of police power). This court further opined that, while "considerations of comity [should not] prevent us from according *Massachusetts* residents the full measure of protection available under the Massachusetts Constitution," "[w]e would not presume to dictate how another State should respond to [our] decision," and "each State is free to address difficult issues of individual liberty in the manner its own Constitution demands" (emphasis added). *Goodridge* v. *Department of Pub. Health, supra* at 340, 341.

This concern for principles of comity is manifested in the language of G. L. c. 207, §§ 11 and 12, which reflects the Legislature's strong interest in defining the boundaries of marriages solemnized in this Commonwealth, and its desire to respect the laws of other jurisdictions. Principles of comity permit the voluntary recognition and enforcement of the judicial proceedings of another State, see *Delk* v. *Gonzalez,* 421 Mass. 525, 530 (1995), provided that a State's own citizens are not unfairly prejudiced thereby, and a State's public policies are not impaired. See *Pacific Wool Growers* v. *Commissioner of Corps. & Taxation,* 305 Mass. 197, 209-210 (1940). Interstate comity is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Perkins* v. *Perkins,* 225 Mass. 82, 86 (1916), quoting *Hilton* v. *Guyot,* 159 U.S. 113, 163, 164 (1895). "[I]t contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually

acted upon it, as a part of the voluntary law of nations." *Hilton*
v. *Guyot, supra* at 165, quoting *Bank of Augusta* v. *Earle*, 38
U.S. (13 Pet.) 519, 589 (1839). "The notions of comity
demanded by our Federal system require us to concede that the
courts of our sister States, even when they reach a different
decision than we would have, are endowed with an equal
measure of wisdom and sympathy." *Delk* v. *Gonzalez, supra.*
Under principles of comity, "Massachusetts generally will
recognize and enforce valid judgments rendered by a foreign
court." *Schiereck* v. *Schiereck*, 14 Mass. App. Ct. 378, 380
(1982). By giving respect and deference to the legislative enact-
ments and public policy pronouncements of other jurisdictions,
it is my hope that principles of comity will have a significant
impact on other jurisdictions if, and when, confronted with the
issue whether to recognize validly contracted same-sex mar-
riages of Massachusetts couples, even where those couples
would not be able legally to marry in such other jurisdictions.

It is true that all individuals, while in Massachusetts, enjoy
the rights and privileges conferred by the laws of this
Commonwealth. See *Woodworth* v. *Spring*, 4 Allen 321, 323
(1862) (one who is "lawfully within the territory and under the
jurisdiction of this commonwealth . . . has a right to claim the
protection and security which our laws afford to all persons
coming within its limits, irrespective of their origin or of the
place where they may be legally domiciled"); *Commonwealth*
v. *Aves*, 18 Pick. 193, 217 (1836) ("all persons coming within
the limits of a state [ ] become subject to all its municipal laws,
civil and criminal, and entitled to the privileges which those
laws confer"). However, the laws of this Commonwealth have
not endowed nonresidents with an unfettered right to marry. To
the contrary, the rights of nonresidents to marry in Mas-
sachusetts have been specifically restricted through the opera-
tion of §§ 11 and 12, by which the Legislature has determined
that, before a nonresident can be issued a marriage license, the
laws of the applicants' home State, including any marital
impediments, must be considered and applied. Only nonresident
couples who come to Massachusetts to marry and intend to
reside in this Commonwealth thereafter can be issued a mar-
riage license without consideration of any impediments to mar-

riage that existed in their former home States. See G. L. c. 207, §§ 11 and 12.

I recognize that the brunt of §§ 11 and 12 has inevitably fallen disproportionately on nonresident same-sex couples, rather than on nonresident opposite-sex couples, because, in the aftermath of *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003), Massachusetts became the only State where same-sex couples could obtain a marriage license. However, the fact that this court concluded in the *Goodridge* case that there was no rational basis under the Massachusetts Constitution for denying Massachusetts same-sex couples the right to enter into civil marriages does not now compel a conclusion that nonresident same-sex couples, who have no intention of living in Massachusetts, have an identical right to secure a marriage license that they could not otherwise obtain in their home States. At issue is the constitutionality of §§ 11 and 12, viewed in light of its discriminatory effect on nonresident same-sex couples, and I conclude those statutory provisions pass constitutional muster.

In *Goodridge* v. *Department of Pub. Health, supra* at 330-331, the court employed a rational basis standard of review in concluding that barring same-sex couples from civil marriage in this Commonwealth violated the due process and equal protection guarantees of the Massachusetts Constitution. The court noted that "[t]he 'right to marry' . . . is different from rights deemed 'fundamental' for equal protection and due process purposes because the State could, in theory, abolish all civil marriage while it cannot, for example, abolish all private property rights." *Id.* at 326 n.14. See *Opinions of the Justices*, 440 Mass. 1201, 1203 (2004). Further, in both *Goodridge* v. *Department of Pub. Health, supra* at 331 n.21, and *Opinions of the Justices*, 440 Mass. at 1206 n.3, this court opined that it need not consider whether to recognize sexual orientation as a suspect classification under Massachusetts law. Here, in neither their complaint nor in their motion for a preliminary injunction did the couples assert that their sexual orientation subjected them to discrimination as a suspect class in violation of the equal rights amendment to the Massachusetts Constitution. Rather, in their motion, the couples claimed that, in light of the

*Goodridge* decision and its progeny, there was no rational basis for the defendants' reliance on G. L. c. 207, § 11, to deny them the right to marry. Accordingly, this rational basis standard of scrutiny is now the appropriate foundation for analysis of the constitutionality of §§ 11 and 12.

When §§ 11 and 12 were enacted in 1913, same-sex marriage was not visible on the horizon of our jurisprudence, suggesting that the Legislature did not, in fact, promulgate these statutes for the express purpose of discriminating against same-sex couples. Cf. *Personnel Adm'r of Mass.* v. *Feeney,* 442 U.S. 256, 274-275 (1979) (Massachusetts veterans' preference statute did not violate equal protection clause of Fourteenth Amendment where statutory classification between veterans and non-veterans was not pretext for gender discrimination). Rather, the focus of §§ 11 and 12 was on the status of all nonresidents who were prohibited from entering into marriage contracts in this Commonwealth where precluded from doing so in their home States. This focus originated from the enactment of the Uniform Marriage Evasion Act in 1912, which was intended to promote general uniformity in the prohibitory laws of every State. See note 3, *supra.* Now, in the aftermath of the *Goodridge* decision, §§ 11 and 12 have found renewed application as nonresident same-sex couples have sought to secure marriage licenses in Massachusetts. The couples have not challenged the Commonwealth's right to revive a statute that they had long thought moribund. The registrar has acknowledged in his affidavit that, before the *Goodridge* case, "detailed enforcement of G. L. c. 207, §§ 11 and 12 was not a stated priority for [the registry of vital records and statistics]." Nonetheless, a lack of detailed statutory enforcement in the past, to the extent that it was necessary, does not preclude more vigorous statutory enforcement in the present. See *Doris* v. *Police Comm'r of Boston,* 374 Mass. 443, 449 (1978); *Burlington* v. *Labor Relations Comm'n,* 12 Mass. App. Ct. 184, 186 (1981).

Here, the couples will be unable to satisfy their heavy burden of demonstrating that the enactment and enforcement of §§ 11 and 12 have no rational basis. "[M]arriage is a social institution, or status, in which, because the foundations of the family and the domestic relations rest upon it, the Commonwealth has

a deep interest to see that its integrity is not put in jeopardy, but maintained." *Coe* v. *Hill*, 201 Mass. 15, 21 (1909). See *French* v. *McAnarney*, 290 Mass. 544, 546 (1935) (marriage not merely a contract between parties, but a social institution of the highest importance). Massachusetts creates and regulates civil marriage to protect the interests of the spouses, any children that are the product of the marriage, and the public in general. Civil marriage "is central to the way the Commonwealth identifies individuals, provides for the orderly distribution of property, ensures that children and adults are cared for and supported whenever possible from private rather than public funds, and tracks important epidemiological and demographic data." *Goodridge* v. *Department of Pub. Health, supra* at 322.

Before it creates a marital relationship, the Commonwealth rationally wants to be certain that the marriage will be properly recognized, regulated, and supported, either by serving as the couple's home State or by knowing that the integrity of the marriage will be protected in another State. Once same-sex couples leave Massachusetts, the Commonwealth's ability to protect and enforce marital benefits and responsibilities, including obligations to children, is significantly compromised. Therefore, a means for achieving the Commonwealth's goal of protecting the marital relationship has been set forth in §§ 11 and 12, through which the Legislature has determined that marriage licenses should not be issued to residents of jurisdictions in which same-sex marriages are prohibited. Simply put, given the enormity of the rights and responsibilities that accompany marriage, Massachusetts has a rational and substantial interest in ensuring that the marriages it creates will be recognized as valid outside its borders.

The Commonwealth also has a significant interest in not meddling in matters in which another State, the one where a couple actually resides, has a paramount interest. See *Sosna* v. *Iowa*, 419 U.S. 393, 407 (1975) (concluding that residency requirement for initiation of divorce action constitutional). "Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders." *Williams* v. *North Carolina*, 317 U.S. 287, 298 (1942). Massachusetts can reasonably believe that nonresident same-sex

couples primarily are coming to this Commonwealth to marry because they want to evade the marriage laws of their home States, and that Massachusetts should not be encouraging such evasion. See *Sosna* v. *Iowa, supra.* Further, as discussed, it is rational, and hopeful, for the Commonwealth to believe that if it adheres to principles of comity and respects the laws of other jurisdictions, then other jurisdictions will correspondingly respect the laws of Massachusetts and recognize same-sex marriages of Massachusetts couples lawfully celebrated in this Commonwealth.

The couples need not agree with the classifications set forth in §§ 11 and 12, and the reasons therefor, as long as there is a rational basis for them. See *Harlfinger* v. *Martin,* 435 Mass. 38, 50 (2001). Because several rational bases exist for the Legislature's determination that §§ 11 and 12 further legitimate State interests by precluding nonresident couples from coming to Massachusetts to marry, in violation of their own home States' laws, I conclude that the couples will be unable to demonstrate a likelihood of success on the merits of their claims that §§ 11 and 12 violate the due process and equal protection guarantees of the Massachusetts Constitution.

6. *Selective enforcement analysis.* As a threshold matter, the clerks contend that the judge erred in concluding that they had no standing to raise a claim that the defendants' interpretation of G. L. c. 207, §§ 11 and 12, which precluded municipal clerks from issuing marriage licenses to nonresident same-sex couples, resulted in unconstitutional selective enforcement of the statutory scheme.[16] I agree with the judge that the clerks had no standing in their official capacities, but I conclude that they did have standing to raise a selective enforcement claim in their individual capacities.

It is a basic principle of our jurisprudence that, with limited exceptions not pertinent here, "governmental entities do not enjoy the constitutional guarantees of due process and equal protection." *Spence* v. *Boston Edison Co.,* 390 Mass. 604, 608

---

[16]When ruling on the *couples'* motion for a preliminary injunction, the judge concluded that they had failed to show selective enforcement of G. L. c. 207, § 11. In the present appeal, the couples have joined in, and rely on, the arguments made by the clerks with respect to this issue.

(1983). See *Massachusetts Bay Transp. Auth.* v. *Auditor of the Commonwealth*, 430 Mass. 783, 792-793 (2000). As such, they "may not challenge the constitutionality of State statutes . . . [or] the constitutionality of the acts of another of the State's agencies" (citations omitted). *Spence* v. *Boston Edison Co.*, *supra* at 610. See *Trustees of Worcester State Hosp.* v. *The Governor*, 395 Mass. 377, 380 (1985). "The decisional law rests on the proposition that constitutional protections belong to 'persons,' including private corporations, who are generally considered independent of the Commonwealth." *Commissioners of Hampden County* v. *Agawam*, 45 Mass. App. Ct. 481, 483 (1998) (county commissioners, as elected officials, did not possess constitutional rights of individual citizens). The clerks' assertion, in their official capacities, of a constitutional claim of selective enforcement of §§ 11 and 12 is therefore barred "by the long-standing and far-reaching prohibition on constitutional challenges by governmental entities to acts of their creator State." *Spence* v. *Boston Edison Co.*, *supra.* See *Massachusetts Bay Transp. Auth.* v. *Auditor of the Commonwealth*, *supra* at 792-793, and cases cited (Massachusetts Bay Transportation Authority, as statutorily created government agency, lacked standing to challenge State statute on constitutional grounds). The duty of a public official is simply to enforce duly enacted and presumptively constitutional statutes. See *Tsongas* v. *Secretary of the Commonwealth*, 362 Mass. 708, 713 (1972) (public officials "had no authority to depart from the statutes [relating to position of candidates on election ballots] on the ground that the statutes were unconstitutional").

In contrast, an individual's ability to challenge the constitutionality of a statute is significantly different from that of a governmental entity. One whose personal interests are directly affected by the operation of a statute can question its validity. See *Horton* v. *Attorney Gen.*, 269 Mass. 503, 513-514 (1929). "From an early day it has been an established principle in this Commonwealth that only persons who have themselves suffered, or who are in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of a coordinate branch of the government." *Kaplan* v. *Bowker*, 333 Mass. 455, 459 (1956).

See *Benefit* v. *Cambridge*, 424 Mass. 918, 921 (1997); *Pratt* v. *Boston*, 396 Mass. 37, 42 (1985). The clerks, as individuals required to enforce the provisions of §§ 11 and 12, have standing to raise a selective enforcement claim where they demonstrated that noncompliance subjected them to the threat of legal harm, namely prosecution under G. L. c. 207, § 50. Criminal fines, imprisonment, or both, could be imposed on a municipal clerk for issuing a marriage license or solemnizing a marriage knowing that the parties were prohibited from marrying by G. L. c. 207, § 11. See G. L. c. 207, § 50. Letters from the Attorney General's office were sent to several municipalities reiterating the provisions of §§ 11 and 12, reminding clerks that same-sex marriages were void or prohibited in all of the other States, and requesting that clerks cease and desist from issuing marriage licenses to nonresident same-sex couples. Further, before instituting an enforcement action under § 50, the Attorney General demanded an explanation for how the decisions of several clerks to issue marriage licenses to nonresident same-sex couples comported with §§ 11 and 12. Contrary to the defendants' argument, the threat of legal harm to the clerks was real and personal, not speculative and remote. There is no indication in the record that the defendants will refrain from enforcing § 50. Accordingly, I conclude that the clerks, in their individual capacities, have standing to raise their selective enforcement claim.

As to the substance of their claim, the clerks contend that the defendants are enforcing G. L. c. 207, §§ 11 and 12, in such a way as to deny nonresident same-sex couples equal protection under the law. They allege that the defendants' enforcement scheme prohibits clerks from issuing marriage licenses to all nonresident same-sex couples while, at the same time, disqualifying few, if any, nonresident opposite-sex couples from receipt of a license for other legal impediments to marriage not pertaining to gender. The clerks assert that this discriminatory enforcement scheme is reflected on the notice of intention of marriage, which focuses on the applicants' place of residence and gender, rather than on other possible legal impediments to marriage. According to the clerks, the defendants' purportedly discriminatory treatment of nonresident same-sex couples is

based on animus, stemming from this court's decision in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003).

The review of an equal protection claim under the Massachusetts Constitution is generally the same as the review of a Federal equal protection claim, see *Dickerson* v. *Attorney Gen.,* 396 Mass. 740, 743 (1986); *Zeller* v. *Cantu*, 395 Mass. 76, 83-84 (1985), although we have recognized that "[t]he Massachusetts Constitution is, if anything, more protective of individual liberty and equality than the Federal Constitution . . . ." *Goodridge* v. *Department of Pub. Health, supra* at 313. The principles of arts. 1 and 10 of our Declaration of Rights, as well as of the Fourteenth Amendment to the United States Constitution, prohibit unequal application of impartial laws. See *Commonwealth* v. *Franklin*, 376 Mass. 885, 894 (1978); *Commonwealth* v. *King*, 374 Mass. 5, 20 (1977). See also *Yick Wo* v. *Hopkins*, 118 U.S. 356, 373-374 (1886). The equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

Liability in an equal protection case where the defendants have been charged with improper selective enforcement of a statutory or regulatory scheme "should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rubinovitz* v. *Rogato*, 60 F.3d 906, 909-910 (1st Cir. 1995), and cases cited. See *Daddario* v. *Cape Cod Comm'n*, 56 Mass. App. Ct. 764, 773 (2002), cert. denied, 540 U.S. 1005 (2003). Plaintiffs who claim an equal protection violation must "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently, instances which have the capacity to demonstrate that [the plaintiffs] were 'singled . . . out for unlawful oppression.' " *Rubinovitz* v. *Rogato, supra* at 910, quoting *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). Allegations of intentional and purposeful discrimination are required. See *Snowden* v. *Hughes*,

321 U.S. 1, 8 (1944) ("The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination"); *LeClair* v. *Saunders,* 627 F.2d 606, 609 (2d Cir. 1980), cert. denied, 450 U.S. 959 (1981). "A firm adherence to a position consistently applied to all license applicants" does not establish selective treatment. *Yerardi's Moody St. Restaurant & Lounge, Inc.* v. *Selectmen of Randolph,* 878 F.2d 16, 21 (1st Cir. 1989).

Here, the clerks have failed to demonstrate a likelihood of success on the merits of their selective enforcement claim. They have not persuasively shown that nonresident same-sex couples are being treated differently from nonresident opposite-sex couples such that §§ 11 and 12 are being selectively enforced. The clerks were specifically instructed by the registrar that all applicants should be treated equally regardless of their race, creed, age, or sexual orientation. They were further instructed to compare the factual information provided on the applicants' notice with the registrar's list of legal impediments to marriage (in Massachusetts and in the applicants' home State) for *all* nonresident couples as to *all* types of impediments. The recently amended notice requests information not only about the applicants' place of residence and gender, but also about consanguinity or affinity, prior marital status, and age. Similarly, the registrar's guide to the legal impediments to marriage in all of the other States, the District of Columbia, and the United States territories provides information as to a variety of legal impediments, not merely those relating to same-sex marriage. I note that when a municipal clerk in Springfield received a notice from an applicant who was below the age of eighteen years, see G. L. c. 207, § 7, the office of the Attorney General investigated the matter, obtained information that the applicant had secured a Probate Court order allowing the marriage, and forwarded the information to the registrar for appropriate disposition.

The clerks have not identified instances where nonresident opposite-sex couples were improperly issued marriage licenses in violation of §§ 11 and 12. When any nonresident couple, whether same-sex or opposite-sex, fails to satisfy the mandates

of §§ 11 and 12, a marriage license simply is not issued.[17] The
fact that, since the *Goodridge* decision, more nonresident same-
sex couples may have been denied marriage licenses in Mas-
sachusetts than nonresident opposite-sex couples subject to
other legal impediments, resulting in a disproportionate impact
on same-sex couples because of their greater numbers, does not
mean that the statute is being selectively enforced. Given my
interpretation of §§ 11 and 12, the registrar has not relied on
those statutory provisions to deny the issuance of marriage
licenses to nonresident same-sex couples where such licenses
should have been granted. The judge properly concluded that
the registrar's enforcement effort was evenhanded and did not
selectively discriminate between similarly situated persons. The
underlying reasons for the registrar's system of enforcement
need not be examined because "we [do not] ordinarily inquire
into the motives for the even-handed enforcement of a valid
statute." *Doris* v. *Police Comm'r of Boston*, 374 Mass. 443,
449-450 (1978).

7. *Privileges and immunities clause analysis.* The couples
contend that the application of G. L. c. 207, §§ 11 and 12, to
nonresident same-sex couples violates the privileges and im-
munities clause of the United States Constitution, which states
that "[t]he Citizens of each State shall be entitled to all
Privileges and Immunities of Citizens in the several States."
U.S. Const., art. IV, § 2. More specifically, they assert that
§§ 11 and 12 discriminate against nonresidents with respect to
privileges and immunities that are enjoyed by Massachusetts
residents, namely the right of individuals to marry the partners
of their choice, as enunciated in *Goodridge* v. *Department of
Pub. Health, supra* at 312-313.[18] The couples argue that the
Commonwealth's differential treatment of nonresidents in these

---

[17]The burden of ensuring that the list of all legal impediments to marriage
is accurate and up to date is on the Commissioner of Public Health, who shall
furnish such list to the clerk or registrar of every town. See G. L. c. 207,
§ 37. Given that laws pertaining to same-sex marriage are in flux throughout
parts of this country, vigilance by the commissioner in continuously updating
the list of legal impediments is critically important so that the municipal
clerks in this Commonwealth will be confident and certain that they are ap-
propriately issuing or denying marriage licenses as the particular circumstances
dictate.

[18]The couples acknowledge that the United States Supreme Court has not

circumstances can only survive constitutional scrutiny if the Commonwealth demonstrates that there is a substantial reason for the discrimination, and that it bears a close, narrowly tailored relation to the Commonwealth's underlying purpose for treating residents and nonresidents unequally. In the couples' view, §§ 11 and 12 cannot withstand such constitutional scrutiny. I disagree and, for the reasons that follow, conclude that the application of §§ 11 and 12 to nonresident same-sex couples does not violate the privileges and immunities clause.

"The [privileges and immunities] clause was intended to fuse a collection of independent States into one nation and was designed to ensure that a citizen of one State who ventures into another State is accorded the same privileges enjoyed by the citizens of that State." *Opinion of the Justices*, 393 Mass. 1201, 1202 (1984). See *Massachusetts Council of Constr. Employers, Inc.* v. *Mayor of Boston*, 384 Mass. 466, 473 (1981), rev'd on other grounds sub nom. *White* v. *Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204 (1983) (privileges and immunities clause designed to facilitate free flow of individuals among States). See also *Supreme Court of N.H.* v. *Piper*, 470 U.S. 274, 279-280 (1985) (privileges and immunities clause intended to create national economic union); *Toomer* v. *Witsell*, 334 U.S. 385, 395 (1948). The clause " 'establishes a norm of comity,' . . . that is to prevail among the States with respect to their treatment of each other's residents." *Matter of Jadd*, 391 Mass. 227, 228 (1984), quoting *Hicklin* v. *Orbeck*, 437 U.S. 518, 523-524 (1978). See *Austin* v. *New Hampshire*, 420 U.S. 656, 660-662, 665-666 (1975) (commuter tax imposed by New Hampshire on Maine residents who worked in New Hampshire violated privileges and immunities clause). However, like several other constitutional provisions, the privileges and immunities clause is not absolute in the protections that it affords citizens, see *Toomer* v. *Witsell, supra* at 396, and a State need not extend to a visitor all of the same rights accorded to a resident. See *Baldwin* v. *Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383 (1978) ("a State [need not] always apply all its

decided whether marriage is a "privilege" of State citizenship for purposes of the privileges and immunities clause.

laws or all its services equally to anyone, resident or nonresident, who may request it so to do").

The plain language of the privileges and immunities clause does not specify those privileges and immunities as to which equality of treatment is required. See U.S. Const., art. IV, § 2. See also *Austin* v. *New Hampshire, supra* at 660; *Matter of Jadd, supra.* Nonetheless, the Supreme Court has enunciated a two-step analysis for assessing challenges brought pursuant to the clause, where nonresidents assert that their rights have been unconstitutionally burdened by a discriminatory statutory classification. See *United Bldg. & Constr. Trades Council* v. *Mayor of Camden,* 465 U.S. 208, 218, 222 (1984); *Massachusetts Council of Constr. Employers, Inc.* v. *Mayor of Boston, supra* at 474. First, a court must determine whether the classification strikes at the heart of an interest deemed so "fundamental" that its derogation would "hinder the formation, the purpose, or the development of a single Union of [the] States." *Baldwin* v. *Fish & Game Comm'n of Mont., supra* at 383, 387 (privileges and immunities clause protects nonresidents who seek to "engage in an essential activity or exercise a basic right"). "Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." *Id.* at 383. See *United Bldg. & Constr. Trades Council* v. *Mayor of Camden, supra* at 218 (only rights deemed fundamental to promotion of interstate harmony fall within purview of privileges and immunities clause). See also *Doe* v. *Bolton,* 410 U.S. 179, 200 (1973) (right to obtain interstate medical services protected by privileges and immunities clause); *Ward* v. *Maryland,* 79 U.S. (12 Wall.) 418, 430 (1871) (right to travel to sell goods protected by privileges and immunities clause); *Matter of Jadd, supra* at 229-230, 237 (right to practice law, an important commercial activity, protected by privileges and immunities clause). Cf. *Corfield* v. *Coryell,* 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (fundamental privileges include the "right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise"). Some interests or rights do not rise to the level of being fundamental so the analysis ends there, and

equality of treatment is not required. See *Baldwin* v. *Fish & Game Comm'n of Mont.*, *supra* at 388 (State may charge nonresident more than it charges resident for same hunting license because hunting is recreation, not means to nonresident's livelihood that is basic to well-being of all States).

If the challenged statutory classification bears on a fundamental right, the court shall proceed to the second stage of analysis to determine whether such classification violates the privileges and immunities clause. The clause "bar[s] discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer* v. *Witsell*, *supra* at 396-397 (imposition of discriminatory license fee on nonresident commercial shrimpers, without reasonable basis, violated privileges and immunities clause). However, the classification enunciated by the statute may be justified if there is a showing that nonresidents constitute a particular source of harm that the Legislature is seeking to remedy. *Id.* at 398. See *Massachusetts Council of Constr. Employers, Inc.* v. *Mayor of Boston*, *supra* at 474. The classification also may be permissible where there is a substantial reason for the difference in treatment other than the mere fact of nonresidency. See *id.* See also *United Bldg. & Constr. Trades Council* v. *Mayor of Camden*, *supra* at 222; *Hicklin* v. *Orbeck*, *supra* at 525. Some matters are so related to individual State sovereignty that discrimination against a nonresident is permitted. See, e.g., *Baldwin* v. *Fish & Game Comm'n of Mont.*, *supra* at 383, 388 (discrimination allowed against nonresidents as to elk hunting); *Ferry* v. *Spokane, Portland & Seattle Ry.*, 258 U.S. 314, 318 (1922) (dower not a privilege or immunity of citizenship, but a right attached to marital contract and subject to State regulation). "[T]he inquiry in each case must be concerned with whether [substantial] reasons [for disparate treatment] do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local [problems] and in prescribing appropriate cures." *Toomer* v. *Witsell*, *supra* at 396. See *Opinion of the Justices*, 393 Mass. 1201, 1203-1204 (1984). "[D]iscrimination must not sweep more broadly than

necessary to achieve the purpose that justifies the discrimination." *Matter of Jadd, supra* at 229.

Here, it is likely that the couples will be unable to demonstrate that the enforcement of G. L. c. 207, §§ 11 and 12, denies them a fundamental right solely on the basis of their nonresidency. Rather than differentiating between all residents and all nonresidents, §§ 11 and 12 differentiate between two types of nonresidents, those who can receive a marriage license in this Commonwealth because there are no legal impediments to their marriages, and those who cannot receive a license because their marriages would be prohibited under the laws of their home States. At a fundamental level, and in accordance with the underlying purpose of the privileges and immunities clause, §§ 11 and 12 promote interstate harmony by mandating respect for the laws of other jurisdictions. Moreover, Massachusetts residents will, in fact, be treated in a similar fashion as nonresidents. General Laws c. 207, § 10, states that if a Massachusetts resident "goes into another jurisdiction and there contracts a marriage prohibited and declared void by the laws of this commonwealth, such marriage shall be null and void for all purposes in this commonwealth." Thus, pursuant to the Massachusetts marriage laws, both residents and nonresidents alike are precluded from going out of their home States and securing a marriage license in another jurisdiction where they would be prohibited from obtaining such a license in their home States. Because residents are essentially subject to the same types of rights and restrictions as nonresidents under the challenged statutes, there is no violation of the privileges and immunities clause.

8. *Conclusion.* The judge in the Superior Court did not err in denying the plaintiffs' motions for preliminary injunctions.[19]

MARSHALL, C.J. (concurring, with whom Cordy, J., joins, and Greaney, J., joins in part). I concur with the court's holding and with much of the reasoning in Justice Spina's opinion. I respect-

---

[19]In light of my conclusion that the plaintiffs have not demonstrated a likelihood of success on the merits of their claims, I need not address the issue of irreparable harm. See *Wilson* v. *Commissioner of Transitional Assistance*, 441 Mass. 846, 858 (2004).

fully disagree, however, with Justice Spina's overly broad and selective construction of G. L. c. 207, § 12, the provision that prevents clerks from issuing marriage licenses to out-of-State residents who are "prohibited from intermarrying by the laws" of their home State. G. L. c. 207, § 12. See *ante* at 358, 361-363 (Spina, J., concurring). His opinion defers to the Attorney General's proposition that, under § 12, any marriage that is not expressly *permitted* by the law of a couple's home State must be deemed "prohibited" by that State.[1] This expansive reading of the statute is not only inconsistent with its plain language, but goes beyond the intent of its enactors, who sought to preserve the legal integrity of marriages performed in Massachusetts while continuing to welcome a broad range of

[1] On April 29, 2004, the Governor, in response to *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309 (2003), sent a letter to the Governors and Attorneys General of each State, as well as to officials in the District of Columbia and the United States territories. The letter expresses the Governor's strong disagreement with the *Goodridge* decision, and calls attention to G. L. c. 207, § 11, concerning void marriages. It states: "It is our view that same-sex marriage is not permitted under the laws of any other state in the nation, including yours. Unless we receive an authoritative statement to the contrary from either you or your representative, the Commonwealth of Massachusetts will not issue a Massachusetts marriage license to same-sex couples from your state." The record does not indicate whether every jurisdiction contacted responded to the Governor. A revised List of Impediments issued by the registrar of vital records and statistics (registrar) to the clerks in May, 2004, states as to each of the forty-nine States, the District of Columbia, and the United States territories that marriages between persons of the same sex are either "void," "prohibited," "not permitted," or "invalid."

Nevertheless, in his brief to this court, the Attorney General concedes that, in at least eight other States and the District of Columbia, it is "uncertain[ ]" whether a Massachusetts same-sex marriage of their residents will be recognized in the home State. He added that two States, New York and Rhode Island, have offered "affirmative suggestion[s]" through statements of the offices of their Attorneys General, that a Massachusetts same-sex marriage of residents of their respective States probably would be recognized. But see *Hernandez* v. *Robles,* 26 A.D. 3d 98 (N.Y. 2005) (appeal to New York Court of Appeals filed December 22, 2005) (concluding that New York domestic relations law, which limits civil marriage to opposite-sex couples, does not violate due process and equal protection provisions of State Constitution). *Hernandez* v. *Robles, supra,* cannot be considered settled law. See N.Y. Civ. Prac. L. & R. § 5601 (McKinney 1995) ("An appeal may be taken to the [Court of Appeals] as of right: from an order of the appellate division which finally determines an action where there is directly involved the construction of the constitution of the state or of the United States . . .").

nonresident couples into the Commonwealth to marry. This interpretation of the statute turns this intent on its head, and does serious damage to the principle of limited government. Taken to its logical end, it would compel us, for instance, to conclude that, in any State where the marriage between a woman and her former brother-in-law or a man and his former sister-in-law is not affirmatively allowed by statutory or decisional law, it is "prohibited" in the home State and therefore may not be contracted in Massachusetts. This is manifestly not the case.

It is also clear that neither Justice Spina nor the Attorney General is willing to apply this reading of § 12 beyond the question of same-sex marriage, a circumstance I find troubling. Justice Spina's analysis of § 12 allows the executive branch to act as the final arbiter of the penumbras of another State's "continually evolving" common law on same-sex marriage, and only same-sex marriage, see *ante* at 361 (Spina, J., concurring), and permits the Commonwealth to cherry-pick the pronouncements as to same-sex marriage to which it will give credence. Because such an interpretation of § 12 departs from sound principles of statutory construction and from the intent of the Legislature, and because it forecloses as a matter of law issues on which at least some of the plaintiff couples should be permitted to present evidence, I must disagree with those portions of his opinion construing the scope of G. L. c. 207, § 12.

Before turning to the statute's plain terms, I pause to emphasize that the relevant question in this case is not what another State might do when confronted with two of its citizens of the same sex who wish to marry. The plaintiffs have asked us to interpret a statute, G. L. c. 207, § 12, and we are obliged to do so in the way our Legislature intended. Where, as here, the statute lays out clear, objective criteria for its enforcement that are not unconstitutional, we must uphold the statute on its own terms. I now consider the statute's meaning.

The first principle of statutory construction is well known. We construe statutes according to the Legislature's intent expressed in the words of the statute read in light of "the ordinary and approved usage of the language." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Applying this established principle, I conclude that the word "prohibited" in § 12 refers

only to marriages that are expressly forbidden by another State's positive law — that is, by constitutional amendment, statute, or controlling appellate decision. See Webster's Third New Int'l Dictionary 1813 (1993) (defining "prohibit" as "to forbid by authority or command"); Black's Law Dictionary 1228 (7th ed. 1999) (defining "prohibit" as "[t]o forbid by law"). Where no "law," "authority," or "command" expressly bans an action, we cannot conclude that it is "prohibited." Thus, G. L. c. 207, § 12, plainly requires the Commonwealth to refrain from issuing marriage licenses to any out-of-State couple whose nuptials would be directly prohibited in their home State and, conversely, to issue marriage licenses and solemnize marriages in all other cases. If the Legislature had meant a broader use of the term "prohibited," it knew how to make that intention clear. See, e.g., G. L. c. 65C, § 21 (*e*) (applying certain death tax provisions to "the estate of a nonresident decedent only in case the laws of the domiciliary state contain a provision, *of any nature or however expressed*, where the commonwealth is given reasonable assurance" that it will collect death taxes from the domiciliary State [emphasis added]).

Assuming, arguendo, that the word "prohibited" in § 12 is in any way unclear (a proposition to which I do not subscribe), the statute's history confirms the Legislature's intent to be as I have discerned it.

That the reach of § 12 extends only to express, controlling prohibitions on a particular marriage is evident from its history. That history begins, in part, with a decision of this court. In *Commonwealth* v. *Lane*, 113 Mass. 458 (1873), the court considered the case of a Massachusetts man convicted of polygamy for marrying a New Hampshire woman after his first wife had divorced him but while she was still living. At the time, Massachusetts statutes made such second marriages unlawful without prior permission of the court, see *id.* at 460, citing to Gen. Stat. 1860 c. 107, §§ 25, 26; and St. 1864 c. 216,[2] but New Hampshire, where Lane married his second wife, did

---

[2]The prohibition on remarriage during the life of the "innocent party" extended only to the "guilty party." See *Commonwealth* v. *Lane*, 113 Mass. 458, 460, 462 (1873). In this case, Lane was the "guilty party," whom his first wife divorced on the ground of adultery. See *id.*

not. In an opinion authored by Chief Justice Gray, the court ruled that Lane could not be prosecuted for polygamy in Massachusetts because no Massachusetts statute expressly forbade recognition of his valid New Hampshire marriage, even where the second marriage rendered Lane "polygamous" under a separate Massachusetts law. See *id.* at 463 (Massachusetts follows the general rule of upholding the validity of the out-of-State marriage if it was validly contracted in the other State unless "the *Legislature* of the Commonwealth has declared [that the marriage] shall not be allowed any validity, because contrary to the policy of our own laws" [emphasis added]). The court concluded: "A [nonpolygamous, nonincestuous] marriage abroad . . . not absolutely void by the law of the country where it was celebrated, is valid here, at least until avoided by a suit instituted for the purpose, even if it might have been so avoided in that country." *Id.*

Nearly forty years later, in 1912 and 1913, the drafters of the Uniform Marriage Evasion Act, see *ante* at note 3 (Spina, J., concurring), cited *Commonwealth* v. *Lane, supra*, in support of the proposition that States should not permit the marriages of out-of-State residents where such marriages would be either void ab initio or prohibited by express statutory provision of the home State. In the Proceedings of the Twenty-Second Annual Conference on Commissioners of Uniform State Laws, the commissioners published their final draft of "An Act relating to and declaring void marriages in another state or country in evasion or violation of the laws of the state" (model act), which was accompanied by annotations. See Report of Commissioners on Uniform State Laws 126-130 (Aug. 1912) (Commissioners' Report).[3] The annotated draft affirmed the general rule that a marriage that is valid where celebrated is valid everywhere (the celebration rule), and noted that the exception to the rule "has been limited or modified by *positive statutory prohibition* or penalty" (emphasis added). Commissioners' Report at 126. To illustrate, the commissioners cited the Massachusetts rule as described in *Commonwealth* v. *Lane, supra*. See Commission-

---

[3]The drafters' comments concerned an earlier version of the model marriage evasion act that was modified and expanded to include separate sections that became, with minor modifications, G. L. c. 207, §§ 10-12, and 50.

ers' Report, *supra* at 126. The Commissioners' Report also noted that, "[as] to marriages against the public policy of any state . . . this act . . . will apply . . . and give full effect to the *prohibitory laws* of each state . . ." (emphasis added). In discussing property rights concerning a marriage celebrated out of State, the commissioners referred specifically to "the penalty of violating the public policy of [a] state of domicile as *declared* by its laws" (emphasis added). *Id.* at 127-128. The commissioners recognized that the model rule was in tension with the celebration rule. They resolved that tension by preserving the celebration rule except in those cases where the home State had put itself on record through a positive statement of the law that the nuptials are "prohibited." *Id.* at 126, 127.[4] We must presume that the Massachusetts legislators who enacted § 12 were well aware of the intent of the model act, particularly because the model act owes a direct debt to Massachusetts law and was adopted in Massachusetts in all material respects.

Insofar as possible, we construe a statutory provision to conform to the entire statutory scheme. See *Roberts* v. *Enterprise Rent-A-Car Co. of Boston, Inc.*, 438 Mass. 187, 194 (2002), *S.C.*, 445 Mass. 811 (2006) ("We interpret statutes as a whole to produce internal consistency"). In line with this principle, in construing § 12, I would adopt the approach Justice Spina has taken in construing § 11.[5] See *ante* at 359-360 (Spina, J., concurring). He properly recognizes that G. L. c. 207, § 11,

---

[4]As Justice Spina acknowledges, the common law is "continually evolving." *Ante* at 361 (Spina, J., concurring). Moreover, the many changing contours of the common law will vary from State to State. It is appropriate for a court to resort to the common law of its own jurisdiction to fill in the gaps and interstices of statutes, see *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 318-320 (2003), and to modify that common law where circumstances so require. In some circumstances it may also be appropriate for a court to plumb the common law of another State. These well-established jurisprudential practices avail nothing in the face of a Massachusetts statute that directs our courts to employ a specific set of criteria for determining the law of another State.

[5]*Goodridge* v. *Department of Pub. Health, supra*, redefined the common-law meaning of "marriage" in Massachusetts as "the voluntary union of two persons as spouses, to the exclusion of all others." *Id.* at 343. The reformulation applies to the use of the term "marriage" anywhere in G. L. c. 207. However, G. L. c. 207, § 12, requires us to determine whether, according to the laws of *another* State, a marriage is prohibited, and thus, for purposes of

concerning marriages void ab initio, must be strictly construed so that its "narrow and specific language" bars only marriages where "the relevant statutory language of the applicant's home State explicitly provides that particular marriages are 'void.' " See *ante* at 359 (Spina, J., concurring). This appropriately cabined construction reflects the Commonwealth's general public policy of favoring the approval of a properly solemnized marriage over its nullification. See, e.g., G. L. c. 207, § 6 (validity of second marriage entered into where party has good faith but mistaken belief that former marriage was terminated). See also *ante* at note 10 (Spina, J., concurring) (citing cases). Cf. *Veazie v. Staples,* 309 Mass. 123, 126 (1941) ("A ceremony of marriage has the technical effect, either of prima facie evidence of its validity, or of casting the burden of proof upon the party denying its validity"); *Raynham v. Canton,* 3 Pick. 293, 297 (1825). The practical and legal considerations that urge caution when determining which marriages of nonresidents the Legislature intends to declare "void" (as in G. L. c. 207, § 11) urge similar restraint when determining which marriages the Legislature intends to declare "prohibited" (as in G. L. c. 207, § 12). No rational reason exists to construe § 11 in the narrowest terms, while construing § 12, adopted by the Legislature at the same time and in the same statute, as expansively as Justice Spina does here.

I turn now to the merits of the plaintiffs' motion for a preliminary injunction. I concur that the plaintiff couples have not met their heavy burden of proving their entitlement to the extraordinary relief they request. However, I do believe that the issues presented are sufficiently pressing to warrant an expedited trial for three plaintiff couples who are entitled to an evidentiary hearing.

At this preliminary injunction stage, we consider only whether the Massachusetts and Federal Constitutions give the Legislature the authority to place limits on entry into civil marriage that are not "arbitrary or capricious." *Goodridge v. Department of Pub. Health,* 440 Mass. 309, 329 (2003), citing *Commonwealth v.*

---

applying § 12, our own definition of marriage does not control. See G. L. c. 233, § 70 (court may take judicial notice of foreign law where relevant to proceedings).

*Henry's Drywall Co.*, 366 Mass. 539, 542 (1974).[6] "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne* v. *Cleburne Living Ctr, Inc.*, 473 U.S. 432, 440 (1985). Although we subject laws to "a more searching form of rational basis review" where "the challenged legislation inhibits personal relationships," *Lawrence* v. *Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *Marcoux* v. *Attorney Gen.*, 375 Mass. 63, 65 n.4 (1978) (challenged legislation is subject to "a continuum of constitutional vulnerability determined at every point by the competing values involved"), "[u]nquestionably, the regulatory power of the Commonwealth over civil marriage is broad. . . ." *Goodridge* v. *Department of Pub. Health, supra* at 326-327.

It is neither arbitrary nor capricious for the Legislature to decide as a matter of public policy to restrict the Massachusetts marriages of out-of-State residents in the manner set forth in G. L. c. 207, §§ 11 and 12. This is so for at least two reasons.[7] First, the Legislature is empowered to, and frequently does, enact laws that erect barriers between in-State and out-of-State residents. See, e.g., G. L. c. 209D, § 1-101 (4) and (16) (defining, respectively, "[h]ome state" and "[r]esponding state" for purposes of Uniform Interstate Family Support Act); G. L. c. 65C, § 21 (*e*). Cf. G. L. c. 112, § 87C (licensing of nondomiciliary accountants limited to those whose State of residency grants Massachusetts accountants "a comparable reciprocal right" of licensing). It is neither unusual nor improper per se for Massachusetts to withhold benefits from nonresidents that it confers on its own residents. Cf. *Sylvester* v. *Commissioner of Revenue*,

---

[6]The plaintiff couples make no claim that they are a suspect class entitled to heightened scrutiny, except insofar as they are nonresidents entitled to the protections of the privileges and immunities clause provisions of the Federal Constitution. See art. 4, § 2, of the United States Constitution. I concur with Justice Spina that their claim to that effect is unpersuasive.

[7]It is true, as the professors of conflict of laws and family law state in their thoughtful amicus brief, that modern-day choice-of-law analysis calls for the weighing of a multitude of considerations, and that it is difficult to predict in general terms how a court will resolve a matter implicating the choice of law. With full respect to these amici, however, as an interpretive tool choice-of-law analysis must yield to the commands of a statute such as G. L. c. 207, § 12, which removes our discretion in deciding how to weigh and apply the law of another State.

445 Mass. 304, 311-312 (2005) (five-year residency requirement imposed by G. L. c. 59, § 5, Twenty-second, for receipt of partial real estate tax exemption by disabled veterans not unconstitutional).

Second, marriage bestows enormous benefits on the couple so united. See *Goodridge* v. *Department of Pub. Health, supra* at 322-324. Given the Commonwealth's strong public policy favoring the lex loci rule, see *supra,* it is rational for the Legislature to direct the Commonwealth's resources to celebrating those marriages of nonresident couples that will not be legally irrelevant in the couple's home State. It is rational for Massachusetts to take precautions that marriages performed here be considered legally binding and not merely aspirational. Put another way, it is rational for the Legislature to take steps to ensure that marriages performed here will hold up elsewhere, and that they will not be ignored by other States. The Commonwealth's concern is not a matter of comity so much as a matter of federalism, that is, of a State's concern for the integrity of its own laws.[8] Standing alone, then, the fact that Massachusetts creates barriers that confer marital benefits on its residents that it denies to nonresidents is not improper.[9]

---

[8]To the extent that *Commonwealth* v. *Aves,* 18 Pick. 193 (1836), has any bearing on this case, as the plaintiff couples argue, it supports the proposition that Massachusetts recognizes that a status conferred by its law may be negated outside of the Commonwealth's borders. In *Commonwealth* v. *Aves, supra,* the court opined that slavery was against the natural rights of human beings and had been abolished by the Massachusetts Constitution of 1780, if not before. *Id.* at 208-209. However, the court also held that, although slavery was against natural and Massachusetts constitutional law, it was nevertheless permitted by the law of nations. *Id.* at 217. From these premises the court reasoned as follows: a slave brought into Massachusetts cannot be forcibly detained as a slave *in Massachusetts* or forcibly removed from the Commonwealth, and will be considered a free person if he elects to reside in the Commonwealth. *Id.* at 224. However, if the individual chooses not to avail himself of the protection of Massachusetts law, either because he elects to reside in a State where slavery is legal, or if he is a fugitive slave under the Federal fugitive slave laws, he cannot claim to avail himself of the liberty conferred by the Massachusetts Constitution. *Id.* Consistent with the holding in *Commonwealth* v. *Aves, supra,* any same-sex couple that chooses to reside in Massachusetts has the full benefit of our laws, while a same-sex couple that elects to reside in a State where same-sex marriage is prohibited cannot claim to avail themselves of that full benefit.

[9]In addition, of course, G. L. c. 207, § 10, prohibits recognition of marriages of Massachusetts residents contracted elsewhere for the purpose of evading our marital laws.

The plaintiff couples' selective enforcement claim has more substance. A statute neutral on its face may violate the equal protection requirements of the Federal and the Massachusetts Constitutions if it results in an intended disparate impact or if it is intentionally or purposefully enforced in an unequal manner to the detriment of a particular class or person. See *Coyne* v. *Somerville*, 770 F. Supp. 740, 744 (D. Mass. 1991), aff'd, 972 F.2d 440 (1st Cir. 1992). See also *Santana* v. *Registrars of Voters of Worcester*, 398 Mass. 862, 866 (1986).[10] I agree with Justice Spina that the Commonwealth's admission that it revived the reverse evasion statute in the wake of the *Goodridge* case, knowing that the statute would disproportionately affect nonresident same-sex couples over nonresident opposite-sex couples, is insufficient on the facts of these cases to prove purposeful discrimination, where the vast majority of States expressly prohibit same-sex couples from marrying. See, e.g., *Santana* v. *Registrars of Voters of Worcester*, *supra* at 865 (finding that defendants' wrongful denial of plaintiffs' right to vote does not bar finding that defendants' actions were not malicious or intentional). The disparate impact that aggrieves the plaintiff couples is the result of the intentional acts of other States, and not the Commonwealth's decision to enforce its own facially neutral laws.

In my view, however, the record leaves no question that the Commonwealth has applied G. L. c. 207, § 12, in a manner purposely intended to deny to any nonresident same-sex couple the opportunity to marry in Massachusetts. Under the expansive construction of § 12 that the registrar of vital records and statistics has promulgated, and that Justice Spina today endorses, the fact that two nonresident applicants for a marriage license are of the same sex works an automatic, nonrebuttable disqualification of their application to marry in Massachusetts. Once a clerk sees that the marriage applicants are of the same sex, rejection of their application necessarily follows. This automatic disqualification applies even to applicants resident in jurisdictions that the Attorney General himself has acknow-

---

[10]No claim is made by either the plaintiff couples or the plaintiff clerks that the statute is not neutral on its face, and the plaintiff couples concede that the Commonwealth may permissibly revive a moribund statute.

ledged may recognize the marriage. See note 1, *supra.* This is a classic case of unequal enforcement. See *Yick Wo* v. *Hopkins,* 118 U.S. 356, 373-374 (1886) (unequal enforcement of laws regulating laundries to disadvantage Chinese business owners).

In my view, both the requirements of G. L. c. 207, § 12, and the requirements of equal protection demand that nonresident same-sex couples who wish to marry in Massachusetts, and who reside in States where they are not expressly prohibited from marrying by statute, constitutional amendment, or controlling appellate court decision, be permitted, at the very least, to present evidence to rebut the Commonwealth's claim that their home State would prohibit their marriage. Such cases would easily lend themselves to summary disposition and thus not overburden our trial courts.

Here, it appears that three of the plaintiff couples, two couples from Rhode Island and one from New York, would be entitled to pursue such claims. See note 1, *supra.*[11] Preliminary injunctive relief is not warranted for these three couples on the record before us. That record discloses, among other things, that each of the New York and Rhode Island plaintiff couples attempted to marry in Massachusetts on the basis of sworn statements averring no knowledge of any impediment to their marriage. However, at the time of signing their respective statements the registrar had concluded, and had so informed all clerks, that same-sex couples from their home States were "prohibited" from marrying in Massachusetts.[12] The couples voluntarily assumed the risk that the Commonwealth would take steps to

---

[11]The remaining five couples reside in States where same-sex marriage is expressly prohibited by statute: Connecticut, Maine, New Hampshire, and Vermont. See Conn. Gen. Stat. Ann. § 46a-81r (West 2004) (listing Connecticut laws that shall not be "deemed or construed" to authorize the recognition or right of marriage between persons of the same sex); Me. Rev. Stat. Ann. tit. 19-A, § 701(5) (West 1998) ("Persons of the same sex may not contract marriage"); N.H. Rev. Stat. Ann. §§ 457:1 (1992) ("No man shall marry . . . any other man"), 457:2 ("No woman shall marry . . . any other woman"); Vt. Stat. Ann. tit. 15, § 8 (LexisNexis 2002) ("Marriage is the legally recognized union of one man and one woman").

[12]Each of the three plaintiff couples, prior to completing their respective notices of intention to marry, were required by statute to be shown a list of impediments to marriage compiled by the registrar pursuant to G. L. c. 207, § 37, and G. L. c. 17, § 4. There is no dispute that the list of impediments issued during the relevant time clearly indicated that the couples were prohibited

deny them (or refuse to record) a certificate to marry, which is precisely what happened. In light of the contradiction between the couples' sworn statements and the list of impediments to marriage duly issued by the registrar, I cannot view the Commonwealth actions as irremediably harmful at this time.

Although preliminary injunctive relief is not warranted, I conclude that the New York and Rhode Island plaintiff couples should be afforded the opportunity to present evidence that their respective States of residence would not prohibit their marriages because in neither State is there a constitutional amendment, statute, or controlling appellate decision to that effect. See *Packaging Industries Group, Inc.* v. *Cheney*, 380 Mass. 609, 617 n.11 (1980) (final judgment in law or equity may vindicate rights where preliminary injunction inappropriate). They should be provided an opportunity to present evidence that their marriage is not expressly "prohibited" by their home State's positive law, i.e., by constitutional amendment, statute, or controlling appellate decision. Given the strong liberty interests involved, I would remand their cases to the Superior Court with instructions to expedite trial.

GREANEY, J. (concurring). I stand by the principles expressed in my separate opinion in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309, 344-350 (2003) (Greaney, J., concurring). The categorical use of gender as an impediment to marriage in Massachusetts is an infringement of the guarantee to the equal enjoyment of fundamental rights, as stated in art. 1 of the Declaration of Rights, as amended by art. 106 of the

from marrying under the laws of their home State (New York and Rhode Island), and thus in Massachusetts. Each plaintiff couple completed the notice of intention by swearing in writing that they knew of no impediments to the marriage, despite (presumably) viewing the notice of impediments precluding them from marrying in Massachusetts. See G. L. c. 207, § 20. The sworn notices were then filed by the plaintiff clerks, who had previously been informed by the registrar that the couples' home States "prohibited" same-sex marriage and they therefore could not marry in Massachusetts. Two couples (one from New York and one from Rhode Island) subsequently received certificates of marriage and had their marriages solemnized in Massachusetts; the Commonwealth has since refused to register the completed marriage certificates. The third couple was informed that the clerk was unable to issue a certificate of marriage to them.

Amendments to the Massachusetts Constitution, and, absent a compelling purpose that can be accomplished in no other reasonable manner, is forbidden by our Constitution. When inflammatory and irrelevant rhetoric is cast aside, we are dealing, in essence, with a basic human right — the right of a qualified couple, irrespective of gender, to enter a solemn civil contract in Massachusetts and to bind each other to commitments that elevate marriage and the family to the highest of social callings.

I referenced G. L. c. 207, §§ 11, 12, and 13, in my concurring opinion in the *Goodridge* case, and predicted that the provisions therein would preclude the use of our *Goodridge* decision to force other States to recognize, as valid, same-sex marriages entered into by nonresidents in Massachusetts. See *id.* at 348 n.4. Further examination of the arguments and case law presented by the parties in connection with this case, especially the decision in *Commonwealth* v. *Aves*, 18 Pick. 193 (1836), has persuaded me that the enforcement of §§ 11 and 12 to bar otherwise qualified[1] nonresident same-sex couples from obtaining marriage licenses in Massachusetts, in the manner that it has been done in the wake of our *Goodridge* decision, is constitutionally impermissible. I see no compelling reason to treat couples who travel here wishing to marry less favorably than our own citizens.

The constitutional basis on which the *Goodridge* case was decided, however, requires a lesser level of scrutiny. The opinion of the court authored by Chief Justice Marshall, in which I joined, found no rational basis on which to uphold, under principles of both due process and equal protection of the Massachusetts Constitution, a marriage statute that extends the benefits of civil marriage only to couples of the opposite sex. Rather than strike down our marriage laws as unconstitutional, the *Goodridge* court redefined civil marriage to mean the "voluntary union of two persons as spouses, to the exclusion of all others" and left "the Legislature's broad discretion to regulate marriage" intact. *Id.* at 343-344. Because I joined in the opinion of the court in that case, I am bound to seek in

---

[1] By "otherwise qualified" I mean satisfying the legal requirements of age, consanguinity, mental competence, and other legal impediments to marriage that may exist under the laws of the jurisdiction where a couple resides.

earnest the existence of rational reasons why the State might enforce the provisions of G. L. c. 207, §§ 11 and 12, to prohibit some nonresident couples from marrying in Massachusetts. Although I continue to adhere to the views expressed in my concurring opinion in the *Goodridge* case, I agree with the conclusion reached today that the plaintiffs have not demonstrated that there is no conceivable rational basis for the provisions of §§ 11 and 12. Beyond that, the statutory analysis contained in Chief Justice Marshall's separate opinion in this case is sound. For this reason, I hereby concur in her conclusion that the construction of the word "prohibit" advanced by the Attorney General and endorsed in Justice Spina's separate opinion results in an overly restrictive interpretation of § 12.

IRELAND, J. (dissenting). I write separately for five reasons. First, I believe that an appellate court must use a neutral, principled approach to decide every case before it. Second, the court articulated such a neutral, principled approach in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003) (*Goodridge*), holding that the liberty and equality provisions of the Constitution of Massachusetts prohibit the use of gender distinctions with respect to marriage. Third, *Goodridge* removed gender as an impediment to marriage (just as *Loving* v. *Virginia*, 388 U.S. 1 [1967], removed race as an impediment), and I believe that the rule of gender neutrality applies to the entire marriage statute. Fourth, principles of comity do not require rejection of the marriage license applications of nonresident same-sex couples. Finally, the Commonwealth's resurrection and selective enforcement of a moribund statute, dormant for almost one hundred years, not only violates the "spirit" of *Goodridge*, as stated by the judge below, but also offends notions of equal protection. It is, at its core, fundamentally unfair.

*Neutral principles.* Because *Goodridge* made new law, I recognize that analytical tools to help us navigate the unchartered waters we now travel are few. However, we are not without any analytical framework to assist us.

I begin with Professor Herbert Wechsler, acclaimed professor, lawyer, and constitutional scholar, who authored Toward Neutral

Principles of Constitutional Law, 73 Harv. L. Rev. 1 (1959).[1] He made the observation that "courts in constitutional determinations face issues that are inescapably 'political' . . . in that they involve a choice among competing values or desires, a choice reflected in the legislative or executive action in question, which the court must either condemn or condone." *Id.* at 15.[2] As Professor Wechsler explained, even in the face of such choices, an appellate court must attempt to employ a well-reasoned and principled approach to each case it decides. Further, he noted, "[a] principled decision . . . is one that rests on reasons with respect to all the issues in the case, reasons that in their generality and their neutrality transcend any immediate result that is involved." *Id.* at 19.

The normative framework this court has endeavored to employ is one that "blend[s] methodologies such as textual analysis, history, common law, structural difference, and comparison to other states" to reach a decision that is, at all corners, grounded in neutrality and uninfected by values or bias. Ireland, How We Do It in Massachusetts, 38 Valparaiso U. L. Rev. 405, 409 (2004). This is the hallmark of judicial interpretation. Indeed, as the plurality decision in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 865-866 (1992), declared:

> "[A] decision without principled justification would be no judicial act at all. . . . The Court must take care to speak and act in ways that allow people to accept its decisions on the terms the Court claims for them, as grounded truly in principle, not as compromises with social and political pressures having, as such, no bearing on the principled choices that the Court is obliged to make."

---

[1] A noted academician, former director of the American Law Institute, and legal giant, Herbert Wechsler was the Harlan Fiske Stone Professor of Constitutional Law Emeritus at Columbia University. He taught generations of law students at Columbia University School of Law, and he also authored several monumental works during his prolific career, including the seminal, Toward Neutral Principles of Constitutional Law, in 1959.

[2] Professor Wechsler's discussion on finding neutral principles to guide constitutional decisionmaking arose from his ongoing debate with Judge Learned Hand regarding the justification for judicial review of legislative and executive action. See Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1 (1959).

The *Goodridge* decision presented such "principled justification," and yielded a neutral rule that applies in this case.

*The Goodridge case.* Before our landmark ruling in *Goodridge*, the marriage statute prevented same-sex couples from marrying in the Commonwealth. In *Goodridge*, we stated that "[f]ar from being ambiguous, the undefined word 'marriage,' as used in G. L. c. 207, confirms the General Court's intent to hew to the term's common-law and quotidian meaning concerning the genders of the marriage partners." *Goodridge, supra* at 319. We did not need to reach the issue whether heightened scrutiny applied to the gender limitation in the marriage licensing statute because it failed to meet even a rational level of review. See *id.* at 331 n.21. See also *Opinions of the Justices*, 440 Mass. 1201, 1206-1207 n.3 (2004). Therefore, contrary to what is being suggested by Justice Spina today, see *ante* at 370-371 (Spina, J., concurring),[3] the issue whether heightened scrutiny applies where the right of same-sex couples to marry is affected is not settled. Further, we did not reach the question whether the Massachusetts State Constitution contains a right to marry, nor did we find that G. L. c. 207 could be "construed to permit same-sex couples to marry." *Goodridge* v. *Department of Pub. Health, supra* at 320. But see *id.* at 345 (Greaney, J., concurring) (marriage is "a fundamental right that is protected against unwarranted State interference"). Instead, the court held that limiting civil marriage to opposite-sex couples lacks a rational basis and "violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution." *Id.* at 342. See *Opinions of the Justices, supra* at 1208 (creation of civil unions impermissible under Massachusetts Constitution). Rather than strike down the marriage laws, however, we redefined the common law and "construe[d] civil marriage to

---

[3]Today, a majority of the court affirms the denial of the plaintiffs' motions for a preliminary injunction based on the statutes' constitutionality as applied to the plaintiff couples. See *ante* at 371-373 (Spina, J., concurring); *ante* at 388-391 (Marshall, C.J., concurring) (disagreeing only with Justice Spina's overly broad construction of G. L. c. 207, § 12). Because Justice Spina's concurring opinion more fully addresses each of the plaintiffs' arguments, and Chief Justice Marshall substantially agrees with Justice Spina's analysis, in this dissent, I have primarily addressed Justice Spina's opinion. Where appropriate, I note distinctions.

mean the voluntary union of two persons as spouses, to the exclusion of all others." *Goodridge, supra* at 343.

Like *Loving* v. *Virginia, supra,* before it, *Goodridge* took a personal characteristic that goes to the essence of who someone is (race and gender, respectively) and removed it as an "impediment" to marriage.[4] See P. Wallenstein, Tell the Court I Love My Wife 240 n.29 (2002)[5] ("What *Loving* did was to remove racial identity as a condition that a state might impose. The decision did nothing to diminish states' authority to regulate incest, bigamy, age of consent, or same-sex marriages"). See also Koppelman, Same-Sex Marriage and Public Policy: The Miscegenation Precedents, 16 Quinnipiac L. Rev. 105, 109 n.13 (1996)[6] (noting that after the Supreme Court of Hawaii invalidated statute prohibiting same-sex marriage as sex discrimination, it is still sex discrimination to require only nonresidents to provide proof of Hawaii residence). Civil marriage in Massachusetts prohibits the use of gender to reject the marriage license applications of any persons who satisfy all other legal requirements, such as age, consanguinity, and divorce. See *Goodridge, supra* at 343-344 (leaving intact the Legislature's broad discretion to regulate marriage).

Moreover, because *Goodridge*'s discussion of marriage was based on "the undefined word 'marriage' as used in G. L. c. 207," *id.* at 319, it logically follows that *Goodridge*'s redefinition of civil marriage applies to the entire marriage statute (G. L. c. 207). See *id.* at 343, and cases cited ("established principles of jurisprudence empower[] a court to refine a

---

[4]Race and gender as social constructs can be quite fluid and ambiguous. However, in this society, they are defining characteristics and are virtually immutable because they cannot easily be altered. See *Kahn* v. *Shevin,* 416 U.S. 351, 357 (1974) (Brennan, J., dissenting, with whom Marshall, J., joined); *Frontiero* v. *Richardson,* 411 U.S. 677, 686 (1973) (opinion of Brennan, J.).

In the context of *Goodridge* v. *Department of Pub. Health,* 440 Mass. 309 (2003) (*Goodridge*), the words "gender" and "sex" have been used interchangeably to mean the physiological "accident of birth" to which society assigns meaning. The language employed in this dissent is consistent with this usage.

[5]Professor Peter Wallenstein teaches history at Virginia Polytechnic Institute and State University.

[6]Professor Andrew Koppelman is a professor of law and political science at Northwestern University.

common-law principle in light of evolving constitutional standards"). A principle, inconsistently applied, is not a principle at all; it is discretion, and amounts to little more than ad hoc adjudication. Thus, I believe our law is settled.

As a matter of State constitutional law, Massachusetts prohibits the use of gender in reviewing the marriage license application of *any* person. See *id.* Instead, marriage licenses must now be issued on a gender-neutral basis. See *id.* at 341 (finding civil marriage ban unjustified and "starkly at odds with the comprehensive network of vigorous, gender-neutral laws promoting stable families and the best interests of children"). Here, as Justice Spina notes, "[t]he clerks were specifically instructed by the registrar that all applicants should be treated equally regardless of their race, creed, age, or sexual orientation." *Ante* at 377 (Spina, J. concurring). Since *Goodridge*, the only relevant inquiries are whether there are "two willing spouses," and, if so, whether any of the listed impediments applies. Therefore, to the extent that G. L. c. 207 serves a gatekeeping function, gender may never be used to prevent a couple from marrying, because gender is no longer an impediment to marriage in Massachusetts. Under the present scheme, however, the marriage application unnecessarily asks applicants their gender, and then clerks impermissibly use this information to trigger mandatory action against nonresident marriage applicants. It is the latter use of the gender of the parties applying for a marriage license that circumvents the principle of gender neutrality established and carefully defined in *Goodridge*, *supra*, and misapplies our holding in that case.[7]

The present procedure allows the State to continue to

---

[7]This case is not about discrimination against the couples because of their sexual orientation. The discrimination the couples have faced is not directly related to their conduct or status as homosexuals, but rather, it is because of their gender. However, as the defendants note and Justice Spina agrees, it is abundantly clear that homosexual couples are the couples most harmed by the gender impediment. See *ante* at 377-378 (Spina, J., concurring). Although we have not declared that discrimination against homosexuals triggers heightened scrutiny, it seems to me that the marriage laws, as interpreted by my colleagues, will work a devastating impact on a class of individuals that, at the very least, the public policy of the Commonwealth protects. See *Goodridge*, *supra* at 341 (noting Massachusetts has a strong affirmative policy of preventing discrimination on the basis of sexual orientation).

discriminate against our nonresident neighbors with whom, like the "members of our community, our neighbors, our coworkers, [and] our friends[,] . . . [w]e share a common humanity . . . ." *Id.* at 349 (Greaney, J., concurring). This discrimination is no less harmful or unconstitutional than that which we rejected in *Goodridge.* See *Opinions of the Justices, supra.* Andrew Koppelman, discussing *Baehr* v. *Lewin,* 74 Haw. 530 (1993), explained it as follows:

> "If it is sex discrimination for Hawaii registrars to deny marriage licenses only to same-sex couples, then it is sex discrimination for Hawaii registrars to require only same-sex couples to provide proof of Hawaii residence. To see the problem, imagine that someone had suggested, after the California Supreme Court invalidated that state's prohibition of interracial marriage, see *Perez* v. *Lippold,* 198 P.2d 1 (Cal. 1948), that California permit interracial marriage only for members of its own community. Such a policy would have required California registrars to *continue to discriminate on the basis of race,* which the court had just construed the state constitution to forbid" (emphasis added).

Koppelman, *supra* at 109 n.13. As in *Goodridge,* here there is no rational basis for such discriminatory treatment of couples applying to marry.

Because I believe our law regarding gender and marriage licenses is settled, my discussion could end here. However, I am also troubled by my colleagues' analysis of the comity and selective enforcement issues raised by the plaintiffs.

*Comity.* Although much time has been devoted to the issue of comity, the question whether other States will give effect to Massachusetts marriages is not before the court.[8] However, speculation as to the answer to that question is precisely what my colleagues' approach to comity requires. I do not believe

---

[8]Indeed, Chief Justice Marshall agrees with this point, pausing "to emphasize that the relevant question in this case is not what another State might do when confronted with two of its citizens of the same sex who wish to marry." *Ante* at 384 (Marshall, C.J., concurring). After this case, however, at least as to the New York and Rhode Island plaintiffs, a Superior Court judge interpreting G. L. c. 207, § 12, will be required to answer this question.

that a discussion of comity is necessary in this case, where it is our marriage law that we are interpreting. Furthermore, even if comity applied to this case, our settled law prevents its application in the way now suggested.

As Justice Spina notes, "[t]he notions of comity demanded by our Federal system require us to concede that the courts of our sister States, even when they reach a different decision than we would have, are endowed with an equal measure of wisdom and sympathy." *Ante* at 369 (Spina, J., concurring), quoting *Delk* v. *Gonzalez*, 421 Mass. 525, 530 (1995). Comity is a voluntary endeavor engaged in by a State, and where a State's public policy is implicated, comity does not apply. See *Pacific Wool Growers* v. *Commissioner of Corps. & Taxation*, 305 Mass. 197, 209-210 (1940); *Perkins* v. *Perkins*, 225 Mass. 82, 86 (1916). Thus, at the outset, it should be clear that *Goodridge* forecloses application of other States' discriminatory marriage laws in the Commonwealth, because such discrimination is against our public policy. However, Justice Spina turns this concept on its head and appears to ground his reasoning, at least in part, on the notion that if we import the discriminatory laws of other States into our marriage statute, those same discriminating States will somehow, applying the principles of comity, recognize the marriages of Massachusetts same-sex couples who choose to move to the discriminating State, stating, for example:

> "By giving respect and deference to the legislative enactments and public policy pronouncements of other jurisdictions, it is my *hope* [and rational and *hopeful* for the Commonwealth to believe] that principles of comity will have a significant impact on other jurisdictions if, and when, confronted with the issue whether to recognize validly contracted same-sex marriages of Massachusetts couples, even where these couples would not be able legally to marry in such other jurisdictions" (emphasis added).

*Ante* at 369, 373 (Spina, J. concurring).

This rationale for barring nonresident same-sex couples from marrying in Massachusetts is also problematic because it

requires making several assumptions regarding each nonresident same-sex couple that applies to marry and, in every case, it presumes a negative result as to the validity of the requested marriage. To answer the questions whether the marriage would be "void" if contracted in the applicants' home State, or if the nonresident same-sex couple is "prohibited from intermarrying" by the laws of the applicants' home State, the court assumes, ab initio, that if the nonresident same-sex couple obtains a marriage license in Massachusetts, the couple will return home; the couple will at some point seek to have the home State recognize the marriage[9]; and the home State will refuse to recognize the couple's same-sex marriage.

Regarding the final assumption, Justice Spina's concurrence suggests that it is permissible for the executive branch, as if looking through a crystal ball, to *predict* the effect of the Massachusetts marriage in the sister jurisdiction as to *all* of the couple's rights and incidents of marriage. A reviewing clerk is then permitted, indeed, required, to use this prediction to prevent the marriage at its very inception. Relying on these assumptions, where the question ultimately answered is whether other States will give effect to a same-sex marriage performed in Massachusetts, is the foundation of Justice Spina's comity discussion. However, as even Justice Spina acknowledges, the question of the effect of a Massachusetts marriage is not now before the court. See *ante* at 363 (Spina, J., concurring). See also *Goodridge, supra* at 340; *Opinions of the Justices, supra* at 1208-1209. Therefore, speculation as to its answer cannot serve as a rational basis for barring nonresident same-sex couples from marrying in the Commonwealth. Moreover, the series of assumptions and analytical tools used by Justice Spina today overlook the complexity of comity as it applies to marriage.

The truth is, we simply do not know how, or whether, other jurisdictions will recognize same-sex marriages performed in Massachusetts. Other States will, of necessity, make determina-

---

[9]These assumptions do not contemplate that a nonresident same-sex couple may want to take advantage of some benefits in Massachusetts as a married couple, such as property ownership. Moreover, a nonresident same-sex couple may want a marriage license to symbolize the couple's continued commitment to a stable, loving relationship, even if their home State does not recognize the marriage and the couple never asks their home State to recognize the marriage.

tions as to the validity of same-sex marriages on a case-by-case basis,[10] and likely quite soon, given the mobility of our modern society. Where the public policy of another jurisdiction prohibits the recognition of same-sex marriage, it is unclear whether Justice Spina's declaration of "hope" announced today will trigger recognition of a Massachusetts same-sex marriage performed for Massachusetts residents. *Ante* at 369 (Spina, J., concurring). Also, with respect to nonresident same-sex couples who marry in Massachusetts, no one can accurately predict the circumstances in which another jurisdiction may elect to give effect to an incident of a same-sex marriage performed here.[11] We would fare much better by interpreting our own marriage

[10]For example, courts have considered issues concerning same-sex partnerships in the context of child rearing that have led to de facto recognition of a same-sex relationship and a surviving partner's right to rear a child born within the relationship. See, e.g., In re Pearlman, No. 87-24926 DA (Fla. Cir. Ct. Mar. 31, 1989) (motion judge set aside grandparents' adoption and granted surviving partner custody after interviewing the child who stated, in camera, "Like, for Christmas I don't really want a present. All I want is to live with Neenie [the surviving partner]. That's my Christmas present").

[11]Section 283(1) of the Restatement (Second) of Conflict of Laws (1971) states: "The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage . . . ." There may be any number of reasons a jurisdiction may decide to recognize an incident of marriage. For example, where failure to recognize a same-sex marriage affects the best interests of a child born within the marriage or renders a former spouse within the marriage a ward of the State, the reviewing court may determine that recognition is necessary.

This issue of recognition has arisen before in the context of statutes or public policy barring miscegenation, polygamy, and adultery. States have recognized interracial and polygamous marriages, and marriages resulting from adultery, for various purposes. See *In re Bir's Estate*, 83 Cal. App. 2d 256 (1948) (California public policy against polygamous marriage did not prohibit two wives from inheriting equal shares of their husband's estate); *Miller* v. *Lucks*, 36 So. 2d 140 (Miss. 1948) (Mississippi's antimiscegenation law did not prevent State's recognition of interracial couple's marriage for purpose of intestate succession); *Lenherr Estate*, 455 Pa. 225 (1974) (Pennsylvania's public policy against marriages resulting from adulterous affairs did not prevent widow of such marriage from enjoying marital exemption to transfer inheritance tax).

Given their recent creation, there is little case law regarding the recognition of civil unions; however, in both Iowa and West Virginia, courts have recognized civil unions for the purpose of dissolution. See In re Marriage of Brown, Equity No. CDCD 119660 (Iowa Dist. Ct. Nov. 14, 2003); In re Mar-

statutes, rather than wading into the complexities of the marriage laws and public policies of other States.[12]

If comity means anything at all, it means that other States must engage in a reasoned analysis when determining the validity of marriages performed in Massachusetts. It does not require the speculation Justice Spina's concurrence announces. The expressed "hope" that other States will recognize marriages performed here cannot serve as a rational basis.[13] Contrary to what Justice Spina's concurring opinion asserts, see *ante* at 369, "hope" is an irrational adjudicatory principle. "Hope" lacks any predictive quality and is not grounded in our jurisprudence. We have declared that there is no rational basis to prevent same-sex couples from marrying in the Commonwealth, and although our "Constitution cannot control such prejudices[,] neither can it tolerate them." *Goodridge*, *supra* at 341-342. What is essential for this court is that our understanding of the meaning of marriage remain consistent with the holding in *Goodridge*.[14]

Perhaps even more fundamental, principles of comity as they

riage of Gorman, Civil Action No. 02-D-292 (W. Va. Fam. Ct. Jan. 3, 2003). We simply cannot predict the myriad circumstances in which a Massachusetts same-sex marriage performed for a nonresident might be recognized, and it is overly simplistic to assert as much.

[12]The attempt to resolve the issue of same-sex marriage for other jurisdictions is also misguided where many of the same residents seeking to marry here could easily travel to Canada to obtain marriage licenses. A quick Internet search reveals several sites dedicated to bringing American same-sex couples to Canada to marry because the Canadian marriage statute lacks any residency requirement. See S.C. 2005, c. 33, assented to July 20, 2005. See also Same-Sex Couple's Lawsuit a Test of Tolerance in Ireland, Boston Globe, Dec. 30, 2005, at A1 & A16, where two women who married in Canada now seek, for tax purposes, to have the Republic of Ireland recognize their marriage.

Moreover, given the globalization of the economy, States may soon be confronted with issues related to same-sex marriages performed in Spain, Belgium, the Netherlands, and the Republic of South Africa, where same-sex marriage is now permitted.

[13]Justice Spina's reasoning also ignores the current political climate, in which over one-half of the States have passed "Defense of Marriage" acts expressly forbidding the recognition of same-sex marriage and Massachusetts State officials have openly encouraged other States to pass such laws if they have not already done so.

[14]I am also concerned by Justice Spina's dismissive approach, *ante* at 363, to G. L. c. 207, § 13, which states: "The three preceding sections shall be so

interact with the liberty provisions of our Constitution do not permit the approach taken by my colleagues today. Indeed, in *Opinions of the Justices, supra* at 1208, we addressed a similar comity-type theory proffered by Justice Sosman in her separate opinion, stating that even if deference to other jurisdictions could justify creating civil unions for same-sex couples, we "would remain unpersuaded." Reiterating our *Goodridge* holding, the court stated that "[o]ur concern . . . is with the Massachusetts Constitution as a charter of governance for every person properly within its reach." *Id.*, quoting *Goodridge, supra* at 312.

This court has held that comity does not limit the application of liberty rights found in the Constitution of Massachusetts to Massachusetts residents. However, Justice Spina dismisses the holding in the still applicable case, *Commonwealth* v. *Aves*, 18 Pick. 193, 217 (1836), stating that §§ 11 and 12 restrict the rights of nonresidents to marry in Massachusetts. *Ante* at 369. But this argument begs the question. In my view, the import of the *Aves* case has to do with the extension of a protection (liberty), offered by the Constitution of the Commonwealth, to Med, a nonresident (a child and a slave from Louisiana), who traveled to the Commonwealth. At the time the *Aves* case was decided, slavery was sanctioned by the Constitution of the United States. It recognized a slave only as three-fifths of a person for purposes of counting the population for representa-

interpreted and construed as to effectuate their general purpose to make uniform the law of those states which enact like legislation." We have no case law interpreting this section; however, a plain reading of the statute suggests that §§ 11 and 12 should only apply to the five States that have enacted "like legislation." See *ante* at note 5 (Marshall, C.J., concurring) (omitting mention of § 13 in discussion of legislative history).

Justice Spina's interpretation of §§ 11, 12, and 13 also ignores the relevant history of the uniform law. In 1943, thirty years after the Uniform Marriage Evasion Act was enacted, the Commissioners on Uniform State Laws withdrew the Act because it had the opposite effect of creating uniformity. Indeed, as the committee on review and revision of uniform and model acts concluded, "[t]he Uniform Act can be effective only if it has widespread adoption; otherwise it merely tends to confuse the law." By failing adequately to interpret § 13, and construing §§ 11 and 12 to require the blanket prohibition of nonresident same-sex marriage, my colleagues resurrect the confusion of which the commissioners disposed over sixty years ago.

tion in the House of Representatives in the slave-holding States, art. I, § 2, third par., and it required the return of fugitive slaves, art. IV, § 3. See art. I, § 9 (allowing States to import slaves until 1808). In the *Aves* case, the court acknowledged the state of the law in the United States. Nevertheless, the court gave Med her freedom when she came to the Commonwealth and ordered her into temporary custody until a guardian could be appointed, stating: "[S]lavery . . . is contrary to natural right, and repugnant to numerous provisions of the [Massachusetts] constitution and laws, designed to secure the liberty and personal rights of all persons within its limits and entitled to the protection of the laws." *Commonwealth* v. *Aves, supra* at 217. Although the court was not called on to inquire about Med's status if she returned to Louisiana, it concluded that "if the slave waives the protection of [the Commonwealth's] laws, and returns to the state where he is held as a slave, his condition is not changed." *Id.* at 218. Despite this conclusion, the court granted her the protection afforded citizens of Massachusetts. The *Aves* case established the principle that a liberty or right under the Constitution of Massachusetts that is available to citizens of Massachusetts can be extended to others who travel here from other States, regardless whether their home States deny them those same rights. Justice Spina's opinion ignores the import of the *Aves* case and creates a second class of persons who seek full protection and enjoyment of the laws of the Commonwealth, quite simply, to marry without the burden of invidious discrimination.

As Chief Justice Marshall points out, under Justice Spina's broad interpretation of the marriage licensing statute, the executive branch would be permitted "to act as the final arbiter of the penumbras of another State's 'continually evolving' common law on same-sex marriage, and only same-sex marriage, see *ante* at 361 (Spina, J., concurring)," and the Commonwealth would be able to "cherry-pick the pronouncements as to same-sex marriage to which it will give credence." *Ante* at 384 (Marshall, C.J., concurring). Despite her disagreement with Justice Spina regarding the interpretation of G. L. c. § 12, Chief Justice Marshall's analysis of principles of comity produces the same result of preventing otherwise qualified same-sex couples from

marriage; it permits the discriminatory gender impediments of other States' laws to be read into G. L. c. 207. See *ante* at 390 (Marshall, C.J., concurring). My colleagues' opinions contradict our established law, ignore the principle of comity established in the *Aves* case, and effectively create a moving target.

"The genius of our Federal system is that each State's Constitution has vitality specific to its own traditions, and that, subject to the minimum requirements of the Fourteenth Amendment, each State is free to address difficult issues of liberty in the manner its own Constitution demands." *Goodridge, supra* at 340-341. We know how our marriage statute should be interpreted, and this should be the guidepost to our decision. As the court established in the *Aves* case, no matter how difficult or politically divisive the issue, comity cannot provide a rational basis to offend the equality and liberty principles of the Massachusetts Constitution.

*Selective enforcement.* As to the plaintiffs' selective enforcement claim, Justice Spina avoids the question by stating that the law applies equally to all persons who apply for a marriage license. See *ante* at 377. This assertion is disingenuous. As Justice Greaney stated in his concurring opinion in *Goodridge, supra* at 346-347:

> "The equal protection infirmity at work here is strikingly similar to (although, perhaps, more subtle than) the invidious discrimination perpetuated by Virginia's antimiscegenation laws and unveiled in the decision of *Loving* v. *Virginia*, [388 U.S. 1 (1967)]. . . . That our marriage laws, unlike antimiscegenation laws, were not enacted purposely to discriminate in no way neutralizes their present discriminatory character."

These statutes are being selectively enforced with animus.

It is not disputed that same-sex couples are more affected by the gender inquiry than heterosexual couples.[15] See *ante* at 370

---

[15]The defendants admit that the renewed enforcement of §§ 11 and 12 of G. L. c. 207 arose from the concern that given the broadening of our marriage statutes after *Goodridge*, same-sex couples from other States might seek to marry in the Commonwealth. Therefore, it is same-sex couples who are most affected by the renewed enforcement.

(Spina, J., concurring) (recognizing that "the brunt of §§ 11 and 12 has inevitably fallen disproportionately on nonresident same-sex couples, rather than on nonresident opposite-sex couples"). Indeed, after *Goodridge*, the Department of Public Health *added* sex of the parties to the notice of intention to marry,[16] and moved away from a more discretionary system where an oath to the clerks that there were no impediments to marry was all that was required by the parties seeking to marry, to one where documentation of the parties' residence is required to receive a marriage license, and the sex of the parties can trigger a refusal to grant it. For example, the record contains a 1995 letter from the registrar of vital records and statistics describing a clerk's duties to review marriage license applications. The letter states:

> "The Registry of Vital Records and Statistics urges each Massachusetts City or Town Clerk to adopt the following as standard procedures when taking a Notice of Intention of Marriage: Do not ask for proof of citizenship or legal status. . . . Do not routinely ask for birth records or other proof of age. . . . Do not . . . ask for proof of divorce."

Further, the registrar stated that the oath taken by parties applying for marriage "affirms that the information they've provided is true to the best of their knowledge. . . . [I]t is not the clerk's job to prevent them from committing perjury. Your job is to assist them in getting married." There is also evidence in the record that, with respect to the impediments to marriage, clerks were simply instructed to point to a posted list of impediments and allow applicants affirmatively to respond whether any of the listed impediments was applicable.

After *Goodridge*, the clerks were issued a new set of instructions that essentially removed the discretionary aspects of the application review process. Clerks were advised to obtain documentation from applicants confirming their residence and where they intend to reside. Failure affirmatively to provide such documentation or otherwise to satisfy the clerk that there is no impediment to marriage will result in refusal to issue the

---

[16]Sex of the parties was implicit in the former application, which designated "bride" and "groom."

marriage license. The impediment most likely to be applied is gender. If a clerk declines to reject the application, he or she will be subject to "enforcement action." These modifications to the review process effectively rewrote the statute and erected an impermissible barrier to marriage.

Our decision in *Goodridge* explicitly removed gender as an impediment to marriage, and therefore these additional inquiries, although in and of themselves not discriminatory, are not required. The only perceivable rationale for the addition of sex to the form is that it is now being used to trigger an unconstitutional second level of review for same-sex couples. Residents of Massachusetts who marry nonresidents of the opposite sex face no such requirements. Nonresidents who marry nonresidents of the opposite sex face no such requirements. Under the new scheme, same-sex couples are not being treated as gender-neutral "couples," which is what our common law requires. Instead, even though sex is no longer an impediment to marriage, nonresident same-sex couples are now illegally singled out precisely because of their gender. This is selective enforcement, and not permitted by our holding in *Goodridge*.[17]

I also note Justice Spina's failure to address the issue of animus. See *ante* at 376. He avoids examining a significant part of the record.[18] The changes to the notice of intention to marry were made in a heated political moment, where the Governor of

[17]Although none of the plaintiffs presents this factual scenario, under the rule announced today, a resident of Massachusetts is not able to marry someone of the same sex from another State unless the nonresident decides to reside in Massachusetts. This is not a burden faced by a resident of Massachusetts who decides to marry a nonresident of the opposite sex, who would have the right to a so-called commuter marriage. Justice Spina cannot claim that the statutes, as he has construed them, afford equal protection to all residents of Massachusetts.

[18]Chief Justice Marshall also avoids the issue of animus, noting that "[t]he disparate impact that aggrieves the plaintiff couples is the result of the intentional acts of other States, and not the Commonwealth's decision to enforce its own facially neutral laws." *Ante* at 391. As the record illustrates, all of the statutes that are the subject of this case, G. L. c. 207, §§ 10-13 and § 50, were resurrected by the Commonwealth to prevent nonresident same-sex couples from marrying in Massachusetts. I therefore also disagree with the Chief Justice's conclusion that it is only the Commonwealth's interpretation of G. L. c. 207, § 12, not the entire statutory scheme, that implicates the selective enforcement doctrine. See *ante* at 391-392 (expansive construction

the Commonwealth made open and numerous pronouncements to other States, through local and national media, expressing his strong disagreement with the *Goodridge* decision. See, e.g., One Man, One Woman, Wall Street Journal, Feb. 5, 2004, opinion page (urging readers to support "defense of marriage" legislation; "[b]eware of activist judges"; and support the passage of a Federal constitutional amendment to prevent gay marriage). Moreover, as Chief Justice Marshall points out, *ante* at note 1, the Governor wrote a letter to the Governors and Attorneys General of every State declaring that the Commonwealth of Massachusetts would not issue a marriage license to a nonresident same-sex couple without an "authoritative statement" from the couple's State rebutting the Governor's presumption that "same-sex marriage is not permitted under the laws of any other state in the nation." In the letter, the Governor also explains that he filed emergency legislation that would allow him personally to address this court to seek a stay of *Goodridge* pending the resolution of a proposed constitutional amendment to limit marriage to one man and one woman.

It is no secret, then, that the changes to the notice were made to limit same-sex marriage to residents of Massachusetts. The additions to the marriage application essentially rewrite the rule regarding gender-neutral marriage that *Goodridge* established and require clerks to use the gender of nonresidents as an impediment to marry. It was done with animus, and it offends the equal protection doctrine. See *Romer* v. *Evans,* 517 U.S. 620, 634-635 (1996), quoting *Department of Agric.* v. *Moreno,* 413 U.S. 528, 534 (1973) ("a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest").

Moreover, the Commonwealth's resurrection of a moribund statute to deny nonresident same-sex couples access to marriage is not only troubling and, as the Superior Court judge stated, offends the "spirit" of *Goodridge,* but also is fundamentally unfair. This law has not been enforced for almost one hundred years, and certainly never with the vitriol currently on display.

of G. L. c. 207, § 12, denies any nonresident opportunity to marry in Massachusetts, resulting in unequal enforcement).

To use a law that has not been used for over one hundred years to deny same-sex couples access to marriage contravenes the public policy of this State to protect all persons, including homosexuals. We have seen this before, and we declared "history must yield to a more fully developed understanding of the invidious quality of the discrimination" before us. *Goodridge, supra* at 328. "One of the most important purposes to be served by the Equal Protection Clause is to ensure that 'public sensibilities' grounded in prejudice and unexamined stereotypes do not become enshrined as part of the official policy of the government." *Hernandez* v. *Robles,* 26 A.D.3d 98 (N.Y. 2005) (Saxe, J., dissenting), quoting *People* v. *Santorelli,* 80 N.Y.2d 875, 881 (1992). The Commonwealth's resurrection of these statutes is deeply rooted in discriminatory notions of marriage, which we have soundly rejected.

In *Goodridge, supra* at 341-342 we declared:

> "The marriage ban works a deep and scarring hardship on a very real segment of the community for no rational reason. The absence of any reasonable relationship between, on the one hand, an absolute disqualification of same-sex couples who wish to enter into civil marriage and, on the other, protection of public health, safety, or general welfare, suggests that the marriage restriction is rooted in persistent prejudices against persons who are . . . homosexual. 'The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.' *Palmore* v. *Sidoti,* 466 U.S. 429, 433 (1984). . . . Limiting the protections, benefits, and obligations of civil marriage to opposite-sex couples violates the basic premises of individual liberty and equality under law protected by the Massachusetts Constitution."

We are bound by our decision in *Goodridge.* Discrimination against same-sex couples, inasmuch as it occurs in the marriage statute, is, in my opinion, unconstitutional.

*Conclusion.* In sum, *Goodridge*'s principle of gender neutrality in marriage licensing applies to the entire marriage statute, and principles of comity do not require rejection of nonresident

same-sex marriage applications. The resurrection and selective enforcement of a moribund statute offend notions of equal protection and fundamental fairness.

However, far from applying the principle of gender neutrality and providing a "blueprint" to anyone regarding application of our marriage statutes, the concurring opinions ignore our redefined common law, and reconstruct the edifice of discrimination we dismantled in *Goodridge.* In doing so, the clock has been effectively turned back to the days when our common law defined marriage as one man and one woman. Therefore, I respectfully dissent.